# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2031

_____

Mayo Foundation,                              *
                                              *
                    Petitioner,               *
                                              *
        v.                                    *
                                              *
Surface Transportation Board;                 *
United States of America,                     *
                                              *
                    Respondents,              *   On Petition for Review of an
                                              *   Order of the Surface
Edison Electric Institute; Western            *   Transportation Board.
Coal Traffic League; National Rural           *
Electric Cooperative Association;             *
City of Highmore, SD; City of                 *
Huron, SD; City of Wolsey, SD;                *
City of Philip, SD; City of Desmet, SD;       *
City of Miller, SD; City of Wall, SD;         *
City of Midland, SD; City of Pierre;          *
City of Ree Heights, SD; Greater              *
Huron Development Corporation;                *
Wall Economic Development                     *
Committee; On Hand Development                *
Corporation; South Dakota Chamber             *
of Commerce & Industry; Farmers               *
Union COOP Elevator Highmore, SD;             *
Farmers Union COOP Elevator                   *
Kennebec, SD; South Dakota Soybean            *
Processors; Urethane Soy Systems              *

Company; OAHE Grain Corporation;  *
South Dakota Association of  *
Cooperatives; South Dakota Farmers  *
Union; South Dakota Grain and Feed  *
Association; South Dakota Wheat  *
Incorporated; Yale Farmers COOP;  *
South Dakota Corn Growers  *
Association; South Dakota Farm  *
Bureau; South Dakota Wheatgrowers  *
Association; North Central Farmers  *
Elevator; Dakota AG COOP; Lake  *
Preston Cooperative Elevator;  *
Dakotaland Feeds LLC; AGFirst  *
Farmers COOP; City of  *
Springfield, MN; City of Balaton, MN;  *
City of Lewiston, MN; City of  *
Stockton, MN; City of Cobden, MN;  *
City of Dover, MN; City of  *
Sanborn, MN; City of Tracy, MN;  *
City of Lake Benton, MN; Minnesota  *
Soybean Processors; Minnesota Grain  *
& Feed Association; Midwest Shippers  *
Association; Minnesota Agri-Growth  *
Council; Winona County; Winona  *
River and Rail, Inc.; Southern  *
Grainbelt Shippers Association;  *
Farmers COOP Hanska, MN; Harvest  *
Land Cooperative; Minnesota Farmers  *
Union; Minnesota Farm Bureau  *
Federation; City of Eyota, MN,  *
                                                          *
            Intervenors on Appeal.     *

-2-

_____

No. 06-2032
_____

City of Rochester,                              *
                                                *
                 Petitioner,                    *
                                                *
        v.                                      *
                                                *
Surface Transportation Board;                   *
United States of America,                       *
                                                *
                 Respondents,                   *
                                                *
Edison Electric Institute; Western              *
Coal Traffic League; National Rural             *
Electric Cooperative Association;               *
Edison Electric Institute; Western              *
Coal Traffic League; National Rural             *
Electric Cooperative Association;               *
City of Highmore, SD; City of                   *
Huron, SD; City of Wolsey, SD;                  *
City of Philip, SD; City of Desmet, SD;         *
City of Miller, SD; City of Wall, SD;           *
City of Midland, SD; City of                    *
Pierre, SD; City of Ree Heights, SD;            *
Greater Huron Development                       *
Corporation; Wall Economic                      *
Development Committee; On Hand                   *
Development Corporation; South                   *
Dakota Chamber of Commerce &                    *
Industry; Farmers Union COOP                    *
Elevator Highmore, SD; Farmers                  *
Union COOP Elevator Kennebec, SD;               *

South Dakota Soybean Processors;     *
Urethane Soy Systems Company;        *
OAHE Grain Corporation; South        *
Dakota Association of Cooperatives;  *
South Dakota Farmers Union; South    *
Dakota Grain and Feed Association;   *
South Dakota Wheat Incorporated;     *
Yale Farmers COOP; South Dakota      *
Corn Growers Association; South      *
Dakota Farm Bureau; South Dakota     *
Wheatgrowers Association; North      *
Central Farmers Elevator; Dakota AG  *
COOP; Lake Preston Cooperative       *
Elevator; Dakotaland Feeds LLC;      *
AGFirst Farmers COOP; City of        *
Springfield, MN; City of Balaton, MN; *
City of Lewiston, MN; City of        *
Stockton; City of Cobden, MN;        *
City of Dover; City of Sanborn;      *
City of Tracy; City of Lake Benton;  *
Minnesota Soybean Processors;        *
Minnesota Grain & Feed Association;  *
Midwest Shippers Association;        *
Minnesota Agri-Growth Council;       *
Winona County Farm Bureau; Winona    *
River and Rail, Inc.; Southern       *
Grainbelt Shippers Association;      *
Farmers COOP Hanska, MN; Harvest     *
Land Cooperative; Minnesota Farmers  *
Union; MN Farm Bureau; City of       *
Eyota, MN,                           *
                                     *
          Intervenors on Appeal.     *

_____

No. 06-2047

_____

| | |
|---|---|
| Sierra Club; Mid States Coalition for Progress, | * |
| | * |
| | * |
| Petitioners, | * |
| | * |
| v. | * |
| | * |
| Surface Transportation Board; | * |
| United States of America, | * |
| | * |
| Respondents. | * |

_____

No. 06-2048

_____

| | |
|---|---|
| Olmsted County, | * |
| | * |
| Petitioner, | * |
| | * |
| v. | * |
| | * |
| Surface Transportation Board; | * |
| United States of America, | * |
| | * |
| Respondents. | * |

_____

Submitted: November 13, 2006
Filed:  December 28, 2006

_____

-5-

Before BYE, ARNOLD, and RILEY, Circuit Judges.
_____

ARNOLD, Circuit Judge.

The petitioners challenge the decision of the Surface Transportation Board, which, after considering the issues that we remanded to it in *Mid States Coalition for Progress v. Surface Transp. Bd.*, 345 F.3d 520 (8th Cir. 2003), and certain other issues, again approved a proposal of the Dakota, Minnesota & Eastern Railroad Corporation (DM&E) to construct approximately 280 miles of new rail line to reach the coal mines of Wyoming's Powder River Basin (PRB) and to upgrade nearly 600 miles of existing rail line in Minnesota and South Dakota. The petitioners contend that in giving its approval the Board violated 49 U.S.C. § 10901 and the National Environmental Policy Act (NEPA), *see* 42 U.S.C. §§ 4321-4347. We deny the petition.

I.

DM&E is required to obtain approval from the Board before constructing the new rail line. *See* 49 U.S.C. § 10901. Because granting such approval is "a major Federal action[] significantly affecting the quality of the human environment," NEPA requires the Board to evaluate the environmental impact of the project. 42 U.S.C. § 4332(2)(C). The Board therefore prepared both a draft environmental impact statement (DEIS) and a final environmental impact statement (FEIS) examining the environmental effects of the proposal, and after imposing 147 conditions designed to mitigate the project's environmentally adverse effects (pursuant to its authority under 49 U.S.C. § 10901(c)), the Board approved the project in 2002.

We reversed the Board's approval of the project for failure to comply with NEPA and remanded the case to the Board. As relevant here, we directed the Board to give further consideration to its decision not to impose mitigating conditions for horn noise (as distinct from wayside noise) and to consider the expected

environmental effects of increased coal consumption due to the availability of shorter and cheaper rail routes for PRB coal distribution. *Mid States*, 345 F.3d at 532, 536, 550. Petitioners do not challenge the Board's disposition of the other remanded issues.

On remand, the Board issued a draft supplemental environmental impact statement (DSEIS), and after receiving comments to the DSEIS, it issued a final supplemental environmental impact statement (FSEIS). The Board thereafter approved the DM&E project based on the analysis in the DSEIS and the FSEIS, specifically addressing the remanded issues as well as additional issues raised during the supplemental environmental review. The Board reimposed the 147 mitigating conditions that it initially imposed in its 2002 approval, modifying one of the conditions to require DM&E community liaisons to assist communities or other entities interested in establishing and funding quiet zones (zones in which horn noise is eliminated).

Relatedly, after the Board's initial approval of the construction project in 2002, it separately approved DM&E's acquisition of over 1,000 miles of existing rail line in Minnesota, Iowa, Kansas, Missouri, Wisconsin, and Illinois from I&M Rail Link (IMRL), with which DM&E has a connection at Owatonna, Minnesota. As discussed below, petitioners raise this addition to DM&E's rail lines as an alternative routing to the contested route through Rochester, Minnesota (the Rochester route connects to points east at Winona, on Minnesota's eastern border).

## II.

The Administrative Procedure Act governs our review of the Board's compliance with NEPA, and requires us to "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

In reviewing the Board's decision, we keep in mind that NEPA requires the Board to "take a hard look at the environmental consequences" of a major federal action before approving such action. *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 97 (1983) (internal quotations marks and citation omitted). As we remarked in *Mid States*, "[o]ur role in the NEPA process 'is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.' " *Mid States*, 345 F.3d at 534 (quoting *Baltimore Gas*, 462 U.S. at 97-98).

## A.

We turn first to the argument raised by the Mayo Foundation, the City of Rochester, and Olmsted County, that DM&E's acquisition of IMRL constitutes "significant new circumstances" that should give rise to the consideration of this new line as an alternative to routing trains through Rochester, *see* 40 C.F.R. §§ 1502.9(c)(1)(ii), 1502.14. The Board disagreed, stating that "it was not necessary to delay the SEIS to include consideration of the impacts of the IMRL acquisition ... The IMRL acquisition and the DM&E construction project are separate and distinct, and each has its own utility and benefit." *Dakota, Minn. & Eastern R.R. Corp.– Constr. into the Powder River Basin*, STB Finance Docket No. 33407 at 19, 2006 WL 383507, at *14 (STB served Feb. 15, 2006) (hereafter STB 2006 Decision).

The Board is required to consider all "reasonable" alternatives. *See* 40 C.F.R. § 1502.14(a). It is not required, however, to consider alternatives that would frustrate the very purpose of the project. As we said in *City of Richfield, Minn. v. F.A.A.*, 152 F.3d 905, 907 (8th Cir. 1998), an "alternative is unreasonable if it does not fulfill the purpose of the project." *See also Missouri Mining, Inc. v. I.C.C.*, 33 F.3d 980, 984 (8th Cir. 1994); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991), *cert. denied*, 502 U.S. 994 (1991).

Even though the Board's decision does not explicitly state that it did not consider the IMRL alternative because that route is simply inconsistent with the project's purposes, we believe that this is implicit in its decision. For one thing, the Board noted that it had "made a preliminary finding in 1998 that there would be transportation and other public benefits from the proposed new line due to improved productivity and efficiency over this shorter route." STB 2006 Decision at 3, 2006 WL 383507, at *2. Furthermore, in stating that the construction and acquisition projects are "separate and distinct, and each has its own utility and benefit," we believe that the Board was relying on and implicitly importing into its decision its earlier findings in both the acquisition and construction proceedings.

The Board recognized in its 1998 decision that central to the success of DM&E's proposed construction project would be its ability to have multiple routing options, including routing trains over the lines of other railroad companies. There, the Board stated that "DM&E's Plan depends on its ability to interchange cars with other railroads," and noted that DM&E's "application identifies three primary interchange points with other railroads: (1) UP at Mankato, MN; (2) I&M Rail Link at Owatonna, MN; and (3) *UP, CP and I&M at Winona/Minnesota City, MN*." *Dakota, Minn. & Eastern R.R. Corp.– Constr. into the Powder River Basin*, STB Finance Docket No. 33407, 3 S.T.B. 847, 900, 1998 WL 869567, at *31 (Dec. 9, 1998) (emphasis added) (hereafter STB 1998 Decision). Removing the ability to route trains through Rochester, Minnesota, to the connection point at Winona, Minnesota, would therefore frustrate the purpose of the construction project.

The Board also discussed at length in its 1998 decision the competitive advantages of a PRB connection added to the DM&E line, primarily focusing on DM&E's shorter, more direct route as compared to its would-be competitors transporting PRB coal to eastern markets. For example, the Board concluded that "[b]ased on DM&E's mileage advantage to the Great Lakes ... we find adequate support in the record ... for DM&E's claim that it could gain a 62% share of the coal

-9-

delivered to this market." STB 1998 Decision at 878, 1998 WL 869567, at *17. The Board further found that "DM&E's assertion that it would gain a 61% share of the tonnage of the Upper Midwest Rail market is based on its mileage advantage to plants accounting for a majority of the tonnages in that market ... we think that DM&E's argument that it would become the dominant rail carrier of coal in the Upper Midwest market is supported on the present record." *Id.* at 881, 882, 1998 WL 869567, at *19, *20. Again, with respect to the Upper Mississippi River market, the Board stated: "Because the plants in this market currently ship one-third of their coal from Wyoming and the DM&E route is at least 140 miles shorter than either BNSF's or UP's from Wyoming origins, it appears that DM&E could have the upper hand in this market." *Id.* at 882, 1998 WL 869567, at *20.

The Board relied on these findings in determining the public benefit and financial soundness of the PRB construction project. And, as the Board points out in its brief in this appeal, the DM&E route through Rochester "would be about 150 miles shorter for movements to certain key plants in Wisconsin than a circuitous DM&E-IMRL route through Owatonna that Petitioners would have the Board force on DM&E."

With respect to the IMRL acquisition, the Board's 2003 decision in that case points to multiple public-interest justifications for the acquisition that are unrelated to DM&E's PRB construction. For example, the Board concluded that "[s]hippers on the DM&E/IC&E system will benefit from the better equipment coordination and utilization, improved service patterns, and other operating efficiencies made possible by common control. Common control also will give shippers ... new routing and service options and more efficient and competitive single-system access to significant new markets and gateways. These beneficial effects for shippers provide additional support for approval of the DM&E/IC&E control transaction." *Dakota, Minn. & Eastern R.R. Corp. and Cedar Am. Rail Holdings, Inc. Control Iowa, Chicago &*

*Eastern R.R. Corp.*, STB Finance Docket No. 34178 at 8, 2003 WL 221559, at *9 (STB served Feb. 3, 2003).

Given this record, it is clear that the Board thoroughly examined the purposes of the two projects, and this examination – as illuminated by the Board's prior decisions – informed its conclusion in its 2006 decision that the IMRL acquisition did not provide a reasonable alternative to DM&E's route through Rochester (the environmental effects of which have been exhaustively studied). The Board was thus not required to consider the environmental impacts of the IMRL alternative, and its decision not to do so was not arbitrary and capricious or an abuse of discretion.

B.

We turn next to the arguments advanced by Rochester and Olmsted County that the Board, in considering the horn noise mitigation issue on remand, should have required DM&E to fund measures required for the establishment of quiet zones in Rochester, to build sound walls in Rochester and Chester, and to install noise insulation at sites subjected to adverse levels of horn noise.

In *Mid States*, we held that the Board did not take the requisite "hard look" at horn noise mitigation because it did not " 'explain fully its course of inquiry, analysis and reasoning' " as to why no mitigation for horn noise was required. *Mid States*, 345 F.3d at 536 (quoting *Minnesota Pub. Interest Research Group v. Butz*, 541 F.2d 1292, 1299 (8th Cir. 1976), *cert. denied*, 430 U.S. 922 (1977)). Specifically, we noted the disparity between the Board's imposition of mitigating conditions for receptors of wayside noise of 70 decibels or higher and its failure to impose mitigating conditions for receptors experiencing similar levels of horn noise. *Mid States*, 345 F.3d at 536. On remand, the Board again decided not to impose horn noise mitigation, other than to require DM&E's community liaisons to assist in the establishment of quiet zones upon request from communities interested in establishing them. STB 2006 Decision at 10, 2006 WL 383507, at *2.

As a preliminary matter, we observe that the Federal Railroad Administration (FRA) recently implemented regulations allowing public authorities to declare quiet zones without formal application to, or approval by, the FRA. 49 C.F.R. § 222.39. To establish a quiet zone without formal application, however, certain safety measures must be installed. The FSEIS estimated that the expense of installing the required safety measures to qualify for quiet zones along the rail line without application would be approximately $2.5 million. FSEIS at 2-16.

Rochester and Olmsted County essentially argue that the Board has the authority to require DM&E to pay for these quiet-zone-related measures and that the Board's decision not to impose this cost on DM&E (as it did with respect to wayside noise mitigation) is arbitrary and capricious. More precisely, Rochester and Olmsted County argue that the Board overly emphasized the cost of horn noise mitigation in its decision not to impose such conditions, and inappropriately failed to consider the cost of the mitigation measures within the context of the total cost of the project (a project the Board admits is "the largest and most challenging rail construction proposal ever to come before the [Board]"). *Dakota, Minn. & Eastern R.R. Corp. Constr. Into the Powder River Basin*, STB Finance Docket No. 33407 at 4 (STB served Jan. 28, 2002).

Olmsted County points out that if the cost of all horn noise-mitigating measures (i.e., quiet zones, sound walls and sound insulation) were included in the estimated cost of all mitigating conditions, the total mitigation costs, using the most conservative estimates, would be 12.2% of the total cost of the project. This assumes an estimate of total mitigation costs (including these three) of $133.5 to $170.5 million (using the upper end of that range) and a total project estimated cost of $1.4 billion (the estimated cost of the project in 2001). (The total project estimated cost is now $2 billion, increased to reflect the increase in construction costs since 2001; and, as Olmsted County points out, if this higher estimate is used, the total cost for mitigating conditions [including the requested horn noise-mitigating measures] drops to 8.5%.)

Olmsted County goes on to argue that the Board admitted in the FSEIS that " '[f]or large capital projects ... it is not unusual for mitigation to total 10 to 20 percent of construction costs,' " *see* FSEIS at 12-24, and therefore that the Board's failure to impose the requested horn noise-mitigation conditions was arbitrary and capricious.

These arguments are initially appealing and certainly beg the question why the Board would not impose such costs when it acknowledges the adverse effects of horn noise on certain affected areas. *See, e.g.*, FSEIS at 2-18, 2-26. And this issue goes to the heart of the ultimate question that Rochester poses, the spirit of which motivated our remand on this issue in *Mid States*: "Why is it reasonable for the Board to require mitigation for wayside noise, but not for horn noise?"

We believe that the Board sufficiently answered this question on remand by pointing out that communities have an option for addressing horn noise concerns (*i.e.*, quiet zones) that they did not have with respect to wayside noise. The Board adopts the rationale set forth in the FSEIS, which states that "the commenters [to the DSEIS] have failed to show that DM&E should be required to fund the establishment of a quiet zone just because this project requires a license and a NEPA review from the Board ... [the Section on Environmental Analysis (SEA)] is aware of no instance where a railroad has been required to fund a quiet zone or other horn noise abatement measures, even under traffic increases in excess of those anticipated as a result of this project." The Board concluded by pointing out that "a variety of Federal, state, and local funding options are available to help communities establish quiet zones. For all of these reasons, [the SEA] does not believe it would be appropriate ... that DM&E be made responsible for establishing or funding ... quiet zones." FSEIS at 2-20 to 2-21.

Not requiring DM&E to provide the funds necessary to implement the needed measures to establish quiet zones, moreover, does not make this option otherwise unavailable to the concerned communities. As further support for its decision not to require DM&E to fund the measures needed to implement quiet zones, the FSEIS

states that the Board "consulted informally with FRA to learn how the numerous communities seeking to establish quiet zones under FRA's Final Rule are planning to fund the necessary grade improvements ... FRA pointed out that for none of the communities seeking quiet zones was a railroad contributing any funding to the effort." FSEIS at 2-18.

The Supreme Court has made clear that a reviewing court cannot substitute its own judgment of reasonableness for that of the agency. In *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 375 (1989), the federal agency argued that the reviewing court need only decide whether the agency's decision not to prepare a supplemental EIS was "arbitrary and capricious," whereas those challenging the agency's action argued "that the reviewing court must make its own determination of reasonableness to ascertain whether the agency action complied with the law." The Court noted that the agency action required a high level of technical expertise, and concluded that "review of the narrow question" was "controlled by the 'arbitrary and capricious' standard of § 706(2)(A)." *Marsh*, 490 U.S. at 375-76; *see also Vermont Yankee Nuclear Power Corp. v. Natural Res. Defense Council, Inc.*, 435 U.S. 519, 555 (1978).

Furthermore, it bears repeating that the court's role "is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Baltimore Gas*, 462 U.S. at 97-98; *see also Friends of Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1128 (8th Cir. 1999). Given the Board's consideration of the adverse effects of the expected increase in horn noise and its reasoned conclusions with respect to what mitigating conditions it would ultimately impose (in addition to its consideration of the options independently available to the affected communities), we believe the Board has met this standard.

The Board's conclusion with respect to another proposed mitigating condition for horn noise – the construction of sound walls in Rochester and Chester – is equally

supported by the Board's disclosure of the environmental concerns and its reasons for ultimately deciding not to require their construction. In its brief, Olmsted County argues that in the "course of rejecting the construction of sound walls for larger communities such as Rochester, the [Board] improperly rejected this mitigation measure for all communities, including smaller communities such as Chester. This one-size-fits-all analysis falls short of the hard look required by NEPA."

What Olmsted County does not include in its brief, though, is that the discussion of sound walls encompassed nearly five pages in the FSEIS, and multiple concerns were advanced questioning the advisability of sound walls in general, not just in Rochester. The FSEIS ultimately recommended against sound walls as a mitigating alternative for horn noise "in light of the safety concerns for motorists, train crews, and pedestrians; questions regarding the ultimate effectiveness of sound walls; and significant costs associated with sound wall construction and maintenance." FSEIS at 2-31. The Board also specifically addressed the issue of sound walls in Chester, stating in the DSEIS that "no sound barriers in Chester, Minnesota warranted consideration due to the minimal length of residential development along the existing line through this community." DSEIS at 2-12 n.22.

We thus believe the Board's rejection of the sound wall mitigating condition, see STB 2006 Decision at 9, 2006 WL 383507, at *6, was not arbitrary and capricious, but rather a reasoned consideration of an ultimately unavailing proposition.

Petitioners do not argue that the Board's rejection of sound insulation treatments was arbitrary and capricious other than in relation to their arguments, discussed above, that the cost of all requested horn noise mitigation measures was not appropriately considered within the larger context of the project's total expected cost. We thus conclude that the Board's rejection of this mitigation measure was not arbitrary and capricious for the same reasons discussed above.

C.

We turn finally to petitioner Sierra Club's argument that the Board did not adequately address what increase in the use of PRB coal – and therefore in certain air polluting emissions – could be expected due to the availability of a shorter, cheaper distribution route from Wyoming's Powder River Basin.

In *Mid States*, we held that the Board inappropriately approved the DM&E construction project "without first examining the effects that may occur as a result of the reasonably foreseeable increase in coal consumption" expected from the project due to the availability of cheaper and easier distribution of PRB coal. *Mid States*, 345 F.3d at 550. We rejected in *Mid States* the Board's argument that such effects are too speculative by pointing to the CEQ regulations specifically designed for " 'evaluating reasonably foreseeable significant adverse effects on the human environment' " when " 'there is incomplete or unavailable information.' " *Id.* at 549-50 (quoting 40 C.F.R. § 1502.22). We also found fault with the FEIS conclusion that further study of this issue was not warranted because the 1990 Clean Air Act Amendments placed caps on sulfur dioxide emissions. We found the FEIS to be inadequate because it did not also include information on the potential increase in emissions of other pollutants – specifically, nitrous oxide, carbon dioxide, particulates and mercury – none of which was subject to caps. As we noted in *Mid States*, moreover, computer "programs could be used to forecast the effects of this project on the consumption of coal." *Mid States*, 345 F.3d at 548-50.

On remand, the Board undertook just such a study using the Energy Information Administration's (EIA) National Energy Modeling System (NEMS). The Board noted in its decision on remand that it chose this computer program, after considering several others, "because it not only forecasts coal supply and demand but also quantifies environmental impacts." STB 2006 Decision at 11, 2006 WL 383507, at *7. The Board concluded, in reliance on the study results, that "on both national and regional levels, projected air emissions for sulfur dioxide, nitrogen oxides, carbon

-16-

dioxide, and mercury associated with the small increase of additional coal usage would be less than 1%" and that "increases for carbon monoxide and particulate matter would also be less than 1%." *Id*. at 12, 2006 WL 383507, at \*9. The Board also noted that there "were no Federal standards for carbon dioxide or mercury at the time EIA ran the rate sensitivity analysis in this case. However, in March 2005, EPA issued rules to regulate mercury, as well as additional regulations for sulfur dioxide and nitrogen oxides emissions at power plants (the Clean Air Interstate Rule)" that will be applicable to DM&E's core markets. *Id.* at 13 n.35, 2006 WL 383507, at \*38 n.35.

The Board admitted that NEMS could not be used to model these impacts at the local level, and thus followed the procedure that the CEQ regulations require when critical information is unavailable or incomplete. These regulations require that the adverse effects be addressed in an environmental impact statement, and, "[i]f the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known," the agency must include the following information in the environmental impact statement:

> (1) A statement that such information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating [such impacts], and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community.

40 C.F.R. § 1502.22(b).

-17-

The Board explained that NEMS is "essentially a national and regional modeling tool" that could not be used to obtain the same level of predictive information for the local level. The Board stated that such predictive information was relevant since "there could be an increase in certain air emissions because more PRB coal would be consumed as a result of this project." With respect to existing credible scientific evidence and its potential impacts, the Board explained further that in order "to reasonably foresee the likely impacts of this project on a local level, [it] would need to know not only what existing or new power plants would actually use DM&E's service, but also whether they would otherwise not burn PRB coal, not burn as much coal, or burn a different mix of coal." The Board concluded that this could not "be determined in advance here with any degree of confidence." STB 2006 Decision at 13, 2006 WL 383507, at *9.

After noting that "the impacts of this project on coal consumption and resulting air emissions would be small" on a national and regional basis and that any potential local air quality impacts were "speculative" and "ultimately unforeseeable," the Board concluded that it was not necessary to impose additional mitigating conditions on the project. *Id.* at 17, 2006 WL 383507, at *12.

The Sierra Club is the only petitioner that maintains that the Board's handling of this issue on remand was inadequate. It argues in its brief that "[i]nstead of conducting the required analysis, the [Board] bolstered the argument that it had unsuccessfully presented to the panel – that not all of the DM&E-transported coal would represent new combustion, that some would be simply a substitute for existing coal supplies, and that it was not, therefore, required by NEPA to address the consequential air pollution within the FEIS."

The Sierra Club's argument is meritless. The DSEIS, the FSEIS, and the Board's decision on remand each extensively discuss the potential impacts on air quality that may result from the implementation of the project. *See* DSEIS at 4-1 to

-18-

4-53; FSEIS at 4-1 to 4-41; STB 2006 Decision at 10-17, 2006 WL 383507, at *7-*13. We therefore believe that the Board more than adequately considered the "reasonably foreseeable significant adverse effects [of increased coal consumption] on the human environment" on remand.

## III.

For the reasons stated above, we affirm the decision of the STB.

_____