# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued May 7, 2010           Decided June 15, 2010

No. 08-1346

COMMUTER RAIL DIVISION OF THE REGIONAL
TRANSPORTATION AUTHORITY, METRA,
PETITIONER

v.

SURFACE TRANSPORTATION BOARD AND
UNITED STATES OF AMERICA,
RESPONDENTS

CANADIAN PACIFIC RAILWAY COMPANY ET AL.,
INTERVENORS

Consolidated with 08-1377

On Petitions for Review of a Final Order
of the Surface Transportation Board

*Robert P. vom Eigen* argued the cause for petitioner
Commuter Rail Division of the Regional Transportation
Authority. *David T. Ralston Jr.* was on brief. *James B.
Dougherty* was on brief for petitioner Sierra Club.

*Theodore L. Hunt*, Attorney, Surface Transportation Board,
argued the cause for the respondents. *Robert B. Nicholson*, *John
P. Fonte* and *Brian C. Toth*, Attorneys, United States

Department of Justice, *Ellen D. Hanson*, General Counsel, Surface Transportation Board, *Evelyn G. Kitay*, Associate General Counsel, and *Anika S. Cooper*, Attorney, were on brief. *Craig M. Keats*, Deputy General Counsel, and *Jeffrey D. Komarow*, Trial Attorney, Surface Transportation Board, entered appearances.

*Richard A. Allen*, *Terence M. Hynes* and *Noah A. Clements* were on brief for intervenors Canadian Pacific Railway Company et al. in support of the respondents.

Before: GINSBURG, HENDERSON and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Canadian Pacific Railway Corporation (CPR), along with its indirect subsidiary Soo Line Holding Company (Soo Holding), and Dakota, Minnesota & Eastern Railroad Corporation (DME), along with its subsidiary Iowa, Chicago & Eastern Railroad Corporation (ICE), (collectively Applicants) applied to the Surface Transportation Board (STB or Board) for approval of a merger in which Soo Holding (and indirectly CPR) was to acquire DME and ICE. They filed the application under 49 U.S.C. § 11324, which authorizes the Board to initiate a proceeding to approve various transactions within its jurisdiction, including the acquisition of one or more railroads by another railroad. *See* 49 U.S.C. §§ 11324(a), 11323. The STB approved the acquisition. *Canadian Pac. Ry. Co.—Control—Dakota, Minn. & E. R.R. Corp.*, 2008 WL 4415850 (STB September 30, 2008) (*DME Acquisition*). Metra and the Sierra Club[1] seek review of the STB's decision

---

[1]Sierra Club is a non-profit conservation organization. Pet'rs' Br. at i. Metra provides commuter rail passenger service in the Chicago metropolitan area over track it shares with freight railroads, and

approving the acquisition. Metra challenges the Board's refusal to attach "conditions" to the approval, pursuant to 49 U.S.C. § 11324(c), in order to protect Metra's rights over its track line running north from Chicago toward Wisconsin over which Soo Holding has trackage rights and for which CPR is the dispatcher. Sierra Club challenges the Board's decision to defer preparation of an environmental impact study (EIS) until CPR decides whether to move forward with the construction of a line connecting DME's track in South Dakota to certain coal mines located in Wyoming's Powder River Basin (PRB). For the reasons set out below, we dismiss Sierra Club's petition for lack of constitutional standing and deny Metra's petition because the Board's approval of the merger was not an abuse of its discretion.

## I.

Metra operates two rail lines that are potentially affected by CPR's acquisition of DME/ICE: one line running west from Chicago (West Line), on which DME and ICE also operate trains, and one line running north (North Line) from Chicago, on which Soo Holding runs trains. CPR is the train dispatcher for both lines pursuant to separate trackage agreements first negotiated in 1985 between CPR/Soo Holding and Metra's predecessor in interest.

In February 1998, DME filed an application with the STB to construct and operate approximately 280 miles of track connecting the PRB coal mines to track DME owned in South Dakota and Minnesota. After an EIS was prepared, the Board approved DME's application in January 2002. *DME Constr.*

---

comprises both the Commuter Rail Division of the Regional Transportation Authority, an Illinois special purpose unit of local government, and the Northeast Illinois Regional Commuter Railroad Corporation, an Illinois municipal corporation. *Id*.

*into the Powder R. Basin*, Finance Docket No. 33407, 2002 WL 121210 (STB Jan. 28, 2002).  The Eighth Circuit vacated and remanded the Board's decision for a supplemental environmental impact statement (SEIS).  *Mid States Coal. for Progress v. STB*, 345 F.3d 520 (8th Cir. 2003).  In 2006, at the conclusion of an 8-year proceeding, the Board again approved DME's application to construct and operate the PRB rail line and the Eighth Circuit upheld the Board's decision.  *Dakota, Minn. & E. R.R. Corp. Constr. into the Powder R. Basin*, Finance Docket No. 33407, 2006 WL 383507 (STB Feb. 13, 2006), *pet. for rev. denied, Mayo Found. v. STB*, 472 F.3d 545 (8th Cir. 2006).

Shortly after the Board's initial approval of the PRB track, it approved an application by ICE to acquire I&M Rail Link (IMRL), which owned track running through Illinois, Minnesota, Missouri and Wisconsin that connected with Metra's West Line.  *See Ia., Chi. & E. R.R. Corp.—Acquisition & Operation Exemption—Lines of I&M Rail Link, LLC*, Finance Docket No. 34177, 2002 WL 1609341 (STB July 22, 2002) (*IMRL Acquisition*).  Aware that DME sought to acquire ICE, the Board deferred considering the "cumulative impacts" of the two acquisitions (of IMRL by ICE and of ICE by DME) together with DME's proposed PRB track construction—because of "the prospect of adding at least a portion of th[e] substantial traffic" from the PRB coal mines to the traffic that already moved over the IMRL lines ICE was acquiring—until such time as DME "obtained authority to control IC[]E" and was "prepared to exercise the construction authority that [the Board] issued" for the PRB line. *IMRL Acquisition* at 16, 2002 WL 1609341, at *8.  Deferral was "appropriate," the Board explained, "given the current uncertainty as to whether the line approved in *DME Construction* will be built and, if built, what portion of the traffic to and from the new line would move over which IMRL lines."  *Id*. at 16, 2002 WL 1609341, at *8.  The Board subsequently approved DME's acquisition of ICE in 2003.

*Dakota, Minn. & E. R.R. Corp.—Control—Ia., Chi. & E. R.R. Corp.,* Finance Docket No. 34178, 2003 WL 221559 (STB Jan. 31. 2003).

While DME's PRB track construction proceeding was pending, Metra, concerned that DME might over-use ICE's trackage rights over Metra's West Line—in particular, for PRB coal traffic —used its right of prior approval over assignment of trackage rights as leverage to negotiate two agreements among Metra, CPR and ICE, which agreements, *inter alia*, limited the level of daily traffic over the line and established fees for exceeding the limit, required Metra's consent before allowing PRB coal traffic and established a procedure to reach consensus on capital contributions and expenditures as necessary to handle additional traffic.

In October 2007, the Applicants filed their application for Board approval of the acquisition of DME/ICE by CPR subsidiary Soo Holding. Application by Canadian Pac. R.R. Co. for Approval of Control of Dakota, Minn. & E. R.R. Corp., Finance Docket No. 35081 (filed Oct. 5, 2007). In their application, they advised the Board that, after conferring with the Board's Section of Environmental Analysis, they believed it was "appropriate" to continue to defer preparing an EIS for transporting PRB coal over ICE's track, explaining it was not "possible . . . to evaluate any potential environmental issues that might be associated with the transportation of PRB coal traffic" because DME had "not yet secured contracts with shippers for the movement of PRB coal over the proposed new PRB line" and CPR had "not yet made a decision to build it." *Id*. at 24.

Sierra Club submitted comments on February 4, 2008, asserting that the Applicants' proposed "[b]ifurcation of its environmental review into two phases would violate the STB's obligation to consider these matters cumulatively." Envt'l Comments of Sierra Club and Sierra Club of/du Can. at 2. The Board agreed with the Applicants' proposal, explaining (1) it

was "satisfied" that the DME acquisition "would not result in an increase in train traffic or rail yard activity in excess of the thresholds for environmental review contained in [its] rules, and there is nothing in the available environmental information that would indicate a potential for significant environmental impacts resulting from the proposed change in corporate control itself" and (2) "the preparation of environmental documentation on routing DM[]E PRB coal traffic over the rail lines of IC[]E and/or CPR[] . . . can and should be deferred until more definitive information is available." *Canadian Pac. R.R. Co.—Control—Dakota, Minn. & E. R.R. Corp.*, Finance Docket No. 35081 at 5-6, 8, 2008 WL 906056, at \*4, \*6 (STB Apr. 3, 2008).

Metra filed comments on March 4, 2008, expressing its concern that (1) CPR, as an interested party with regard to the West Line because of its acquisition of DME/ICE, could no longer be relied upon as a neutral enforcer of the 2003 agreements, (2) CPR might divert traffic from Metra's West Line (which was subject to the 2003 trackage agreement's limitations) to Metra's North Line (which was not subject to such limitations) and (3) construction of the PRB line (with its additional traffic on Metra's tracks) was more likely if the merger went through. Metra Comments in Opposition to Proposed Transaction & Request for Conditions at 7 (Metra Comments). Accordingly, Metra asked that the STB impose seven "conditions" on CPR's acquisition of DME/ICE pursuant to 49 U.S.C. § 11324(c), namely, that (1) CPR transfer to Metra the right to dispatch trains over its North and West Lines; (2) CPR refrain from operating PRB coal trains over either the West or North Line until Metra upgraded both lines; (3) CPR bear the expense of capacity improvements necessary for operating the PRB coal trains; (4) CPR pay Metra excess traffic fees for the North Line like those negotiated in the West Line agreements; (5) all trains originating or terminating on DME/ICE track and operating on either the West or North Line be considered ICE

trains for the purpose of any agreement Metra has with CPR, DME or ICE; (6) CPR and its affiliates acknowledge that they may not admit a third party carrier to either the West or North Line; and (7) CPR negotiate with Metra appropriate agreements to incorporate the preceding six conditions. *Id*. at 9-10.

The STB approved CPR's acquisition of DME/ICE on September 29, 2008. *See DME Acquisition*, *supra*. It first determined that, because the acquisition "does not involve the merger or control of two or more Class I railroads,"[2] it is governed by subsection (d) rather than subsection (b) of 49 U.S.C. § 11324, the latter of which by its terms applies to an application for "merger or control of *at least two* Class I railroads," 49 U.S.C. § 11324(b) (emphasis added); *DME Acquisition* at 8, 2008 WL 4415850, at *5. Subsection (d) provides in relevant part:

> In a proceeding under this section which does not involve the merger or control of at least two Class I railroads, as defined by the Board, the Board shall approve such an application unless it finds that—
>
>> (1) as a result of the transaction, there is likely to be substantial lessening of competition, creation of a monopoly, or restraint of trade in freight surface transportation in any region of the United States; and

---

[2] A Class I carrier has annual carrier operating revenues of $250 million or more while a Class II carrier has annual carrier operating revenues of less than $250 million but more than $20 million. 49 C.F.R. § 1201.1-1. Although CPR is a Class I railroad, DME and ICE are both Class II railroads.

> (2) the anticompetitive effects of the transaction outweigh the public interest in meeting significant transportation needs.

49 U.S.C. § 11324(d). Noting that the "primary focus" of subsection (d) is "whether there would be adverse competitive impacts that are both likely and substantial"—and, if so, "whether the anticompetitive impacts would outweigh the benefits or could be mitigated through conditions," *DME Acquisition* at 8, 2008 WL 4415850, at *5—the Board concluded that "the public benefits of the transaction offset any minimal decrease in geographic competition," *id*. at 11, 2008 WL 4415850, at *7. The Board further denied Metra's proposed conditions because they "do[] not relate to competition, the major focus of [a] section 11324(d) analysis" and because it believed such conditions were better left to "commercial negotiation," given "the intricate details involved in coordinating freight and passenger rail operations, capital expenditures, and compensation." *Id*. at 15, 2008 WL 4415850, at *10. Citing CPR's stated "commit[ment] to working cooperatively with Metra," the Board "strongly encourage[d] both parties to work together to achieve a mutually acceptable arrangement to govern joint operations." *Id*. In addition, the Board confirmed its intent to defer preparing an EIS, explaining that it was "not 'bifurcating' [its] environmental process," as Sierra Club charged, but rather it "ha[d] determined that the acquisition itself does not have sufficient potential to affect the environment to require environmental documentation and that a determination of what cumulative effect the Board's approval of *DM[]E PRB Construction* might have on the Board's approval of the proposed acquisition here is premature." *Id*. at 25, 2008 WL 4415850, at *19. This was so because the Board expressly forestalled such effects by "impos[ing] conditions precluding applicants from carrying [PRB] traffic over IC[]E and/or CPR[] lines until an EIS has been prepared." *Id*.

Metra filed a timely petition for review on October 29, 2008 and Sierra Club followed suit on December 1, 2008.

## II.

Sierra Club challenges the Board's failure to prepare an EIS before approving CPR's acquisition of DME. Metra challenges the Board's approval of the acquisition without imposing conditions on the North Line similar to those in place on the West Line. We address, and reject, each challenge in turn.

### *A. Sierra Club*

Sierra Club contends that the Board's decision to defer the EIS of the cumulative effects of the railroad acquisitions and the PRB line construction violated the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq., which "requires agencies to prepare an environmental evaluation for all proposals for 'major Federal actions significantly affecting the quality of the human environment.' " *Citizens Against Rails-to-Trails v. STB*, 267 F.3d 1144, 1150 (D.C. Cir. 2001) (quoting 42 U.S.C. § 4332(2)(C)). The STB responds that Sierra Club lacks standing under Article III of the United States Constitution to challenge its decision. We agree.

Sierra Club claims Article III standing as the representative of two of its members whose sworn declarations it has submitted: Mark A. Snyder and Sam N. Clauson. An organization has representational standing to litigate on behalf of its members "if '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.' " *Int'l Bhd. of Teamsters v. Transp. Sec. Admin.*, 429 F.3d 1130, 1134-35 (D.C. Cir. 2005) (quoting *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 553 (1996)) (internal quotation omitted). Sierra Club fails the first

prong of this test because it has not shown that either of the two members has standing in his own right.

"The 'irreducible constitutional minimum of standing contains three elements': (1) injury-in-fact, (2) causation, and (3) redressability." *Jackson County, N.C. v. FERC*, 589 F.3d 1284, 1288 (D.C. Cir. 2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)) (internal quotation omitted). Thus, to demonstrate standing, "a petitioner must allege (1) a personal injury-in-fact that is (2) fairly traceable to the defendant's conduct and (3) redressable by the relief requested." *Int'l Bhd. of Teamsters*, 429 F.3d at 1134 (internal quotations omitted). Sierra Club has not made the required showing because neither Snyder's declaration nor Clauson's declaration alleges an injury that was caused by the Board's decision in this case.

Clauson, an "environmentalist" and "avid hunter" who lives in Rapid City, South Dakota, claims he will be injured by the STB's decision approving the DME acquisition because (1) "the proposed CP[R]/DM&E rail line . . . will drive away the deer and antelope" that he hunts nearby and (2) the "coal train traffic . . . will be a frequent source of noise and air pollution, and it will disturb the natural tranquility of the wild places" he visits. Sam N. Clauson ¶¶ 4-6 (dated Dec. 2, 2009). The claimed injuries, however, will not be traceable to the Board's decision in this case; nor can they be redressed in this proceeding. Construction of the proposed rail line of which Clauson complains was finally authorized in 2006 and the Eighth Circuit found the Board's EIS and SEIS fully satisfied NEPA's requirements for that "major Federal action." *See Mid States Coal. for Progress*, 345 F.3d 520; *Mayo Found.*, 472 F.3d 545. The EIS the Board deferred in this proceeding is the EIS required to assess the additional cumulative environmental effects caused by "the possible future movement of DM[]E PRB coal traffic *over the IC[]E and CPR[] lines*" attributable to the

subsequent corporate acquisitions (of IMRL by ICE, ICE by DME and DME by CPR). *DME Acquisition* at 7-8 (emphasis added). If the Board's decision here is overturned, the construction authorization would not be affected and no new EIS would be required for the area Clauson visits and hunts.

Snyder, who lives in Minneapolis (a location not covered by the STB's 2006 PRB line construction authorization), alleges as his injury that, "[i]f the Canadian Pacific Rail [CPR] system is opened to large coal trains, it will create noise, dust, vibration and adverse visual impacts, and have an adverse impact on [his] quality of life" inasmuch as he can see and feel the vibration of CPR trains in his neighborhood and he occasionally hikes on trails close to the CPR track. Decl. of Mark A. Snyder ¶¶ 4-7 (dated Dec. 3, 2009). Again, the alleged injuries are not traceable to the Board's decision in *DME Acquisition*, which expressly prohibits coal traffic on the subject track until after an EIS is completed:

> Approval of the [CPR/DME/ICE] control application in STB Finance Docket No. 35081 is subject to the condition that applicants may not transport over lines currently operated by IC[]E and/or CPR[] unit trains of coal originating on the new rail line approved for construction in *DM[]E PRB Construction*, until the Board has prepared an Environmental Impact Statement, and has issued a final decision addressing the environmental impacts of such coal operations and allowed such operations to begin.

STB Decision 27 ¶ 3, 2008 WL 4415850, at *20. The alleged injuries, should they ever occur, would result from the Board's contemplated "final decision addressing the environmental impacts" and expressly authorizing coal traffic from the PRB (via the yet-to-be-constructed PRB extension) to travel over existing lines now operated by ICE or CPR. And under the terms of the just quoted passage, such a decision will not issue

until after an EIS has been prepared, the very relief Sierra Club seeks. Meanwhile, the Board's approval of the DME acquisition by itself—without the addition of coal traffic to the line—will cause Snyder no injury. He remains free to live in and hike the area undisturbed by PRB coal traffic.

Because Sierra Club has not shown, as it must, "a causal connection between the government action that supposedly required the disregarded procedure"—here, approval of the DME acquisition— "and some reasonably increased risk of injury to its particularized interest," we dismiss its petition for lack of standing. *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc).

### B. Metra

Metra challenges the STB's refusal to impose the conditions Metra requested pursuant to subsection (c) of 49 U.S.C. § 11324. Subsection (c) provides in relevant part: "The Board shall approve and authorize a transaction under this section when it finds the transaction is consistent with the public interest. The Board may impose conditions governing the transaction, including the divestiture of parallel tracks or requiring the granting of trackage rights and access to other facilities." Under this provision, the Board "has extraordinarily broad discretion in deciding whether to impose protective conditions in the context of railroad consolidations." *Grainbelt Corp. v. STB*, 109 F.3d 794, 798-99 (D.C. Cir. 1997) (citing predecessor provision 49 U.S.C. § 11344(c), applicable to STB's predecessor, the Interstate Commerce Commission) (internal quotation omitted). "Affording 'great deference' to the [Board's] selection of such conditions," we "will deny a petition for review so long as the [Board's] decision is supported by substantial evidence in the record and was reached by reasoned decision-making." *Id*. at 798-99 (citing 5 U.S.C. § 706(2)(A) & (E); *Lamoille Valley R.R. v. ICC*, 711 F.2d 295, 307 (D.C. Cir. 1983)). The Board's decision satisfies this standard.

Metra argues first that the STB construed section 11324 too narrowly to preclude—in a subsection (d) proceeding—imposing subsection (c) conditions that are "not designed to remedy a competitive problem"—contrary to the Board's own previous interpretations of subsection (c) as conferring "broad" conditioning authority. Pet'rs' Br. at 24-25 & n.22. We find Metra's reading of the Board's decision too cramped.

It is true the Board observed that "Metra's alleged harm does not relate to competition, the major focus of [its] section 11324(d) analysis," *DME Acquisition* at 15, 2008 WL 4415850, at *10—and reasonably so. Subsection (d)'s primary focus is indeed to preserve competition after a merger or acquisition and Metra acknowledges the Board's past practice has been to "generally impose[] conditions on § 11324(d) transactions designed only to mitigate anticompetitive impacts of such transactions." Pet'rs' Br. at 24 n.22. But the Board did not stop there—it also made an affirmative determination not to impose the conditions Metra sought because they address contractual issues the Board considered properly the subject of contract negotiations, not Board directives:

> Moreover, Metra seeks material changes to (or extensions of) existing agreements, or to compel new contractual commitments from CPR[] to protect Metra from potential traffic increases that it might not have considered during prior contractual negotiations. We will not use our conditioning power here to compel resolution of potential differences between CPR[] and Metra with respect to operating, dispatching, and compensation matters. Given the intricate details involved in coordinating freight and passenger rail operations, capital expenditures, and compensation, commercial negotiation seems to be the better avenue for resolving such issues. CPR[] has indicated that it remains committed to working cooperatively with

> Metra, and the Board strongly encourages both parties to work together to achieve a mutually acceptable arrangement to govern joint operations.

*DME Acquisition* at 15, 2008 WL 4415850, at \*10.  In short, the Board declined to use its conditioning authority to alter (or interpret) the existing contractual terms in Metra's favor, consistent with its past practice. *See CSX Corp.—Control & Operating Leases/Agreements—Conrail, Inc.*, 3 S.T.B. 196, 297 (1998) ("[T]hese parties seek material changes to, or extensions of, existing contracts, or to compel new contractual commitments or property sales . . . . We are reluctant to use our conditioning power to compel resolution of differences between freight railroads and passenger agencies with respect to operating, dispatching, and compensation matters.").

Metra also argues the STB abused its discretion under subsection (c) in refusing to consider the merger's impact on Metra's "commuter services" pursuant to the Board's "essential services regulations." Pet'rs' Br. at 31-32 (citing 49 C.F.R. § 1180.1(c)(2)(ii)).  Contrary to Metra's claim, however, the Board did consider the impact on Metra's essential passenger services, *DME Acquisition* at 13-14, 2008 WL 4415850, at \*9-10, and concluded it was best addressed through contract negotiations, as we discussed above.  In so reasoning, the Board did not abuse its discretion.  Metra successfully negotiated comparable conditions in the 2003 agreements governing the West Line and we see no reason why it cannot attempt to do the same now, as the Board urged, in light of CPR's expressed "commit[ment] to working cooperatively with Metra." *Id*. at 15, 2008 WL 4415850, at \*10.  In any event, even under the 1985 trackage agreement governing the North Line, CPR is required to "provide priority to Metra's schedules and operations, and to ensure that there be no material interference with that service." Metra Comments at 4.  Accordingly, if negotiations fail and CPR does not afford the unimpeded priority guaranteed under

the 1985 agreement, then, as the Board noted, "any contractual disputes between Metra and CPR[] can be litigated by them in an appropriate court." *DME Acquisition* at 15 n.25, 2008 WL 4415850, at *10 n.25. As we have noted, this merger does not involve two or more Class I railroads. We do not decide whether the Board's determination that negotiation or litigation is the best avenue to address impacts on Metra's services would be reasonable in the context of a merger that does involve two or more Class I railroads. In such mergers, the Board is expressly required by statute to "consider," inter alia, "the effect of the proposed transaction on the adequacy of transportation to the public." 49 U.S.C. § 11324(b).

For the foregoing reasons, Sierra Club's petition for review is dismissed for lack of jurisdiction and Metra's petition for review is denied.

*So ordered.*