# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 10, 2010      Decided March 15, 2011

No. 09-1002

VILLAGE OF BARRINGTON, ILLINOIS,
PETITIONER

v.

SURFACE TRANSPORTATION BOARD AND UNITED STATES OF
AMERICA,
RESPONDENTS

CANADIAN NATIONAL RAILWAY COMPANY, ET AL.,
INTERVENORS

———

Consolidated with 09-1028, 09-1048, 09-1049, 09-1073

———

On Petitions for Review of an Order
of the Surface Transportation Board

———

*Kevin M. Sheys* argued the cause for Community Petitioners. With him on the briefs were *Barry M. Hartman*, *Edward R. Gower*, *Joel D. Bertocchi*, and *Richard H. Streeter*.

*Paul A. Cunningham* argued the cause for petitioners Canadian National Railway Company and Grand Trunk Corporation. With him on the briefs were *David A. Hirsh* and *Theodore K. Kalick*.

*Evelyn G. Kitay*, Associate General Counsel, Surface Transportation Board, argued the cause for respondents. With her on the brief were *Mary Gabrielle Sprague*, *Robert B. Nicholson*, and *John P. Fonte*, Attorneys, U.S. Department of Justice, *Craig M. Keats*, Acting General Counsel, Surface Transportation Board, and *Jeffrey D. Komarow*, *Theodore L. Hunt*, and *J. Frederick Miller*, *Jr.*, Attorneys, Surface Transportation Board. *John C. Cruden*, Assistant Attorney General, U.S. Department of Justice, entered an appearance.

*Kevin M. Sheys*, *Barry M. Hartman*, and *Richard H. Streeter* were on the joint brief of Community intervenors.

*Paul A. Cunningham*, *David A. Hirsh* and *Theodore K. Kalick* were on the brief for intervenors Canadian National Railway Company and Grand Trunk Corporation in support of respondents.

Before: HENDERSON, TATEL, and GRIFFITH, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: This case presents a difficult question of statutory interpretation: in enacting the Staggers Rail Act of 1980, did Congress deprive the Surface Transportation Board of its authority to impose environmental conditions when approving so-called minor mergers? For the reasons set forth in this opinion, we conclude that it did not and that the Board therefore retains its environmental conditioning authority. We also conclude that in approving the merger at issue in this case, the Board complied with the National Environmental Policy Act and that the environmental conditions it imposed are neither arbitrary nor capricious.

3

**I.**

CHICAGO

Hog Butcher for the World,
Tool Maker, Stacker of Wheat,
Player with Railroads and the Nation's Freight Handler;
Stormy, husky, brawling,
City of the Big Shoulders.

Today, almost a century after Carl Sandburg's paean to America's Second City, Chicago remains "the Nation's Freight Handler." Chicago is the only city where all seven of America's Class I railroads—railroads with annual operating revenues of $250 million or more—operate. *Canadian Nat'l Ry. Co.—Control—EJ&E W. Co.*, STB Finance Docket No. 35087, Final Environmental Impact Statement, at 1-3 (Dec. 5, 2008) ("*FEIS*"). Each day, 600 freight trains carrying approximately 2.5 million tons of freight pass through Chicago. *Id.* at 1-4. Converging in the Chicago Terminal District—a 2,800 mile rail network containing 70 train yards and terminals—these freight trains compete for track and yard space with each other and with over 750 commuter trains and 78 Amtrak trains per day, which together serve over 84 million passengers a year. *Id.* The resulting congestion slows freight traffic to a crawl. By one estimate, "[m]oving freight across the Chicago region by rail . . . typically takes two days or more, with train speeds averaging between 6.8 and 12 m.p.h." Business Leaders for Transportation, *Critical Cargo: A Regional Freight Action Agenda* 1 (Apr. 2002). Because "[o]ne-third of all rail freight in the United States currently moves to, from, or through Chicago," *FEIS* at 1-4, the city's congestion affects the entire nation.

Petitioner Canadian National, a Class I railroad, operates over twenty thousand miles of track in North America,

connecting the Gulf Coast to its transcontinental rail network in Canada. *Id.* at 1-6. Canadian National's Chicago rail system consists of five rail lines that converge on the city like the spokes of a wheel from the north, west, southwest, south, and southeast. Because Canadian National's lines meet in the heart of the Chicago Terminal District, even those trains that merely pass through the city—about two-thirds of the company's Chicago trains—must contend with the city's congestion. Canadian National estimates that its freight trains may take as long as 24 hours to move the thirty miles through the metropolitan area. *Id.* at 1-4.

Looping around Chicago, the 120-mile Elgin, Joliet, & Eastern main line, once known as the "J" line and referred to throughout these proceedings as the EJ&E line, starts near the Lake Michigan waterfront, north of Chicago in Waukegan, Illinois, arcs south and west through the city's suburbs including Lake Bluff, Barrington, and Aurora, to Joliet, Illinois, travels east to Gary, Indiana, and finally turns northwest and travels along Lake Michigan towards Chicago. Along the way, the EJ&E cuts across all five Canadian National rail lines. This rail beltway has encircled Chicago since the late nineteenth century when J.P. Morgan assembled it to "avoid the Chicago bottleneck." David M. Young, *The Iron Horse and the Windy City* 115 (2005). Although daily traffic along the EJ&E line peaked during World War II at as many as fifty trains, the line has generally averaged between ten and twenty trains, dropping by the mid-2000s to between three and eighteen trains per day. *Canadian Nat'l Ry. Co.—Control—EJ&E W. Co.*, STB Finance Docket No. 35087, Decision No. 16, at 5 (Dec. 24, 2008) ("*Approval*"); *FEIS* app. A, at 391, 394.

Canadian National, anticipating that owning the EJ&E line would enable it to avoid Chicago's congestion, agreed to

acquire the EJ&E Railway Company (a non–Class I railroad) for $300 million on September 25, 2007. Using the EJ&E line and its three rail yards, Canadian National planned to re-route freight trains from its five Chicago lines around the congestion that ensnarls the city's Terminal District. The effect on the EJ&E line and on Canadian National's five existing lines is expected to be significant. While freight traffic will likely decline along Canadian National's existing tracks within the beltway, daily traffic on the EJ&E line will rise to between twenty and forty-two trains, some almost as long as two miles.

Before Canadian National could complete its acquisition of the EJ&E Railway Company, it was required to obtain the Surface Transportation Board's approval, which it sought on October 30, 2007. *See* 49 U.S.C. § 11323. Because the acquisition involved only one Class I railroad, the Board classified the transaction as a "minor" merger, meaning that it needed to approve the transaction within 180 days unless it found that the merger was likely to cause substantial anticompetitive effects. *See* 49 U.S.C. §§ 11324(d), 11325(a), (d). Finding that the substantial increase in freight traffic along the EJ&E line resulting from this transaction would "significantly affect[] the quality of the human environment," 42 U.S.C. § 4332(2)(C), the Board also directed its Section of Environmental Analysis (SEA) to prepare an environmental impact statement. The Board explained that it would use the environmental impact statement to decide whether to impose "environmental mitigation conditions" if and when it approved the transaction. *Canadian Nat'l Ry. Co.—Control—EJ&E W. Co.*, STB Finance Docket No. 35087, Decision No. 2, at 15 (Nov. 26, 2007).

In the course of preparing the final environmental impact statement, SEA engaged in extensive public outreach, which

included publishing notices in the Federal Register and ads in local newspapers, holding twenty-two public meetings attended by over 7200 people, consulting with local, state, and federal agencies and officials, publishing for comment a 3500 page draft environmental impact statement, holding a sixty day comment period on that draft, and receiving nearly 13,500 comments. Commenters raised concerns about the effect of Canadian National's acquisition on traffic congestion, rail crossing safety, emergency response times, hazardous material spills, and wildlife, among other issues.

Given that nearly 340,000 people live in close proximity to the EJ&E line and that 73% of road crossings lack bridges over the tracks, SEA considered how increased freight traffic on the EJ&E line would worsen vehicle congestion and increase the risk of collisions between trains and vehicles. SEA winnowed the list of 112 railroad crossings along the EJ&E line down to the 13 most "substantially affected" crossings. For four of those crossings, SEA recommended traffic advisory signals. But for the two "substantially affected" crossings for which traffic delays and the threat of collision were particularly serious, SEA recommended "grade separation"—i.e., a bridge over the tracks.

After SEA completed the final environmental impact statement, the Surface Transportation Board approved Canadian National's acquisition of the EJ&E Railway Company on December 24, 2008—approximately four hundred days after Canadian National first sought approval. *See Approval*. The Board concluded "that the proposed control transaction is unlikely to cause a substantial lessening of competition or to create a monopoly or restraint of trade," *id.* at 13, and that "even if there were some modest anticompetitive effect, it would be outweighed by the public interest in meeting significant transportation needs," *id.* at 15.

The Board also responded to comments made during the preparation of the environmental impact statement. Chief among them was a memorandum Canadian National submitted on September 30, 2008, the last day of the comment period, which challenged the Board's statutory authority to impose environmental conditions on "minor" transactions. According to the memorandum, 49 U.S.C. § 11324(d) ("subsection (d)") (emphasis added), which provides that "the Board *shall* approve" a "minor" merger "unless [the Board] finds that" the merger is likely to cause substantial anticompetitive effects, prohibits the Board from imposing any conditions, including environmental conditions, unrelated to competition. With this comment, Canadian National totally reversed the position it had taken throughout the Board's review. For example, in comments to the Board filed on November 21, 2007, the railroad acknowledged that the Board could "impose environmental mitigation conditions on its approval" notwithstanding the requirement that the Board approve the merger once the Board found it unlikely to present anti-competitive concerns. Canadian National Reply to Barrington Req. for EIS 8 n.10, Nov. 21, 2007 (included at J.A. 706). Canadian National made similar statements in filings to the Board in February, March, and August 2008. Repeating that mantra, Canadian National President and CEO Hunter Harrison told the House Transportation Committee that Congress had no need to pass legislation expressly granting the Board environmental conditioning authority because "under the existing act, [while] a minor transaction cannot be turned down on environmental issues[, i]t can be mitigated. . . . [W]e are perfectly willing to deal with that—to resolve the environmental issues, mitigate the environmental issues." *The "Taking Responsible Action for Community Safety Act": Hearing on H.R. 6707 Before H. Comm. on Transp. and Infrastructure*, 110th Cong. 51 (Sept. 9, 2008)

(statement of E. Hunter Harrison, President & CEO, Canadian National Railway Co.) But only twenty-one days after Harrison testified before Congress, on the last 4 pages of its 152-page memorandum, Canadian National switched its position, arguing for the first time that the Board lacks authority to impose environmental conditions on "minor" mergers.

The Board began its response to Canadian National's argument by barring the railroad from raising this objection, explaining that Canadian National had waived the objection by waiting too long to raise it and that the company was estopped from maintaining a position clearly inconsistent with the one its CEO had advanced before Congress. The Board nonetheless considered Canadian National's argument "for the benefit of future applicants," and found that it had authority to impose conditions unrelated to competition-concerns. *Approval* at 29. The Board located that authority in 49 U.S.C. § 11324(c) ("subsection (c)"), which states "[t]he Board may impose conditions governing the transaction . . . ."

Having established that it possesses environmental conditioning authority, the Board then exercised that authority by imposing conditions to mitigate the effects of the transaction and by requiring Canadian National to comply with voluntary mitigation commitments negotiated with several affected communities. Central to this case, the Board imposed Condition 14, which required Canadian National to bear 67% of the costs of building a grade separation at Ogden Avenue, near Aurora, Illinois, and 78.5% of the costs of building one at Lincoln Highway in Lynwood, Illinois. Together these two conditions are expected to cost Canadian National approximately $68 million.

On January 31, 2009, Canadian National consummated its acquisition of the EJ&E line. It then filed a petition for review in this court, challenging Condition 14 as both unlawful and arbitrary and capricious. Approximately a dozen local governmental entities, including the Village of Barrington, ("Community Petitioners") also filed petitions for review, challenging the Board's compliance with the National Environmental Policy Act ("NEPA"). We consolidated the petitions and consider them all in this opinion.

## II.

We must first determine whether Canadian National preserved its argument that the Surface Transportation Board lacks environmental conditioning authority. Abandoning its estoppel rationale, the Board now argues only that Canadian National has waived this argument because it waited too long to raise it forcefully during the administrative process. Community Petitioners also argue that Canadian National should be barred, but for a different reason—that the railroad consummated the acquisition of the EJ&E line before challenging the conditions in this court.

In support of its waiver decision, the Board argues that Canadian National "had an obvious obligation to raise its objections to the Board's conditioning authority clearly and early in the proceeding so that the issue could be fully aired," Resp't's Br. 23, especially since the railroad was aware of the Board's interpretation, the Board having previously imposed environmental conditions on "minor" mergers involving Canadian National. Acknowledging, as it must, that Canadian National's comment arrived early enough for it to respond, the Board nonetheless insists that Canadian National's tardiness prejudiced other commenters by depriving them of the opportunity to develop their own counterarguments.

In response, Canadian National emphasizes that it fully complied with the schedule the Board itself established. As the railroad points out, it raised its objection during the comment period on the draft environmental impact statement—the "one formal opportunity for comments" after the Board "suggest[ed] imposing something akin to Condition 14." Canadian National Reply Br. 14 ("CN's Reply Br."). Canadian National argues as well that neither the Board, which took eighty-five days to respond to its objection, nor other commenters, who sought no post-comment period opportunity to rebut Canadian National's argument and who would have had little to offer on this question of "pure statutory interpretation," were prejudiced by its last minute filing. *Id.* at 14–15.

Although Canadian National's change in position might well have surprised Congress and the affected communities, its actions fall short of the standard for waiver the Supreme Court set forth in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519 (1978), and *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33 (1952). In those two cases, the Supreme Court established a rule that requires parties to "forcefully present[]," *Vermont Yankee*, 435 U.S. at 554 (internal quotation marks omitted), their arguments "at the time appropriate under [agency] practice," *L.A. Tucker Truck Lines*, 344 U.S. at 37, or else waive the right to raise those arguments on appeal. "Simple fairness to those who are engaged in the tasks of administration, and to litigants," demands such a rule. *Id.* This rule ensures that agencies will have the opportunity to develop their positions and correct their errors before an appeal. *Id.* As for litigants, it " 'is essential . . . that parties . . . have the opportunity to offer all the evidence they believe relevant to the issues which the [agency] is alone competent to decide [and] . . . that litigants

. . . not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence.' " *Sims v. Apfel*, 530 U.S. 103, 109 (2000) (quoting *Hormel v. Helvering,* 312 U.S. 552, 556 (1941)).

Here, all parties agree that Canadian National "forcefully presented" its challenge on September 30, 2008, the last day of the draft environmental impact statement's comment period. *Vermont Yankee*, 435 U.S. at 554. The Board offers no convincing explanation for why this timing was not "appropriate under [the Board's] practice." *L.A. Tucker Truck Lines*, 344 U.S. at 37. After all, Canadian National submitted its comment within the period the Board itself designated. And unlike in *L.A. Tucker Truck Lines*, where the waived argument was raised for the first time on appeal, and in *Vermont Yankee*, where the Intervenor developed on appeal an argument presented in only a "cryptic and obscure" manner to the agency, *Vermont Yankee* 435 U.S. at 554, here the Board had adequate time and opportunity to respond to a clearly articulated argument *before* Canadian National filed its petition for review.

The Board nonetheless urges us to follow the Eighth Circuit's reasoning in *Otter Tail Power Co. v. Surface Transportation Board*, 484 F.3d 959 (8th Cir. 2007). There, the Eighth Circuit barred as "fatally late" an argument raised for the first time in a party's simultaneously submitted final brief because the other party "had no opportunity to investigate or respond . . . [and because] the Board [lacked] the opportunity to receive evidence relating to" the waived argument. *Id.* at 963. According to the Board, a similar concern exists here because Canadian National's last-minute timing deprived other commenters of any scheduled opportunity to offer a rebuttal. But we are disinclined to follow *Otter Tail* because both there and here the Board could

have structured its procedures to provide such rebuttal time. Moreover, accepting the Board's waiver theory would present line-drawing questions that defy principled resolution. Wouldn't an argument raised for the first time on the second-to-last day of the comment period also deprive other commenters of the opportunity to respond? What about one raised with a week remaining? In any event, this case is distinguishable from *Otter Tail* given that the issue before us is one of pure statutory interpretation, which does not depend on evidence that an objecting commenter might provide. Waiver is thus inappropriate under the circumstances of this case.

We are similarly unpersuaded by Community Petitioners' estoppel argument. Relying on *Federal Power Commission v. Colorado Interstate Gas Co.*, 348 U.S. 492 (1955), and *Kaneb Services, Inc. v. Federal Savings & Loan Insurance Corp.*, 650 F.2d 78 (5th Cir. 1981), Community Petitioners argue that once Canadian National "voluntarily consummated its transaction based on [the Board's] conditioned approval," estoppel barred the railroad from challenging those conditions. Community Intervenors' Br. 6–7. Yet unlike this case, *Colorado Gas* and *Kaneb* dealt with collateral attacks on conditions that had been imposed in *earlier* proceedings from which no appeal had been taken. The finality and opportunism concerns that motivated the courts in those cases are absent here because Canadian National has filed a timely petition for review directly from the proceeding where the conditions were imposed.

## III.

We turn, then, to the merits of Canadian National's statutory challenge. The railroad argues that subsection (d), which mandates that "the Board *shall* approve" a "minor" merger "unless it finds that" the merger is likely to cause

anticompetitive effects, prohibits the Surface Transportation Board from imposing conditions other than those related to competition—such as the environmental conditions at issue here. 49 U.S.C. § 11324(d) (emphasis added). The Board rejected Canadian National's interpretation, reasoning that subsection (c)'s language—"the Board may impose conditions governing the transaction"—applies to approvals of all mergers, including "minor" mergers. Because resolving this question turns significantly on the text of the Board's organic statute and on how Congress has shaped that text over the years, we don our conductor's cap for a ride through the relevant rail regulatory history.

The Interstate Commerce Commission was the original federal railroad regulator, retaining that role until Congress abolished the Commission in 1995 and transferred its remaining railroad regulatory authority to the Surface Transportation Board. Since 1920, the Commission's, and now the Board's, responsibilities have included reviewing all railroad mergers and acquisitions. As was true then and is true now, before a railroad could acquire another railroad or any of its lines, it first had to obtain the Commission's, and now the Board's, approval. *See* 49 U.S.C. § 11323. Until 1980, 49 U.S.C. § 11344(b) and (c) (now recodified as 49 U.S.C. § 11324(b) and (c)) set the standards under which the Commission approved and imposed conditions on all mergers. Subsection (b) included a non-exhaustive list of four factors that the Commission was required to consider and subsection (c) provided the more general "public interest" standard. In relevant part, subsection (c) stated as follows:

> The Commission shall approve and authorize a transaction under this section when it finds the transaction is consistent with the public

> interest. The Commission may impose conditions governing the transaction.

49 U.S.C. § 11344(c) (1978). Under subsection (c)'s "public interest" standard, the Commission possessed "extraordinarily broad" discretion to decide not only whether to disapprove a merger and on what basis, but also what kind of conditions, if any, to impose on the merged railroad. *S. Pac. Transp. Co. v. ICC*, 736 F.2d 708, 721 (D.C. Cir. 1984). Though the Board points to no pre-1980 examples of the Commission imposing environmental conditions specifically, the Board argues, and Canadian National nowhere disagrees, that the Commission had authority to disapprove or to impose conditions based on environmental issues.

Seeking to expedite approval of smaller mergers "where approval is routinely and consistently granted," Congress passed the Staggers Rail Act of 1980, H.R. Rep. No. 96-1430, at 121 (1980) (Conf. Rep.), which added the following subsection (d):

> (d) In a proceeding under this section which does not involve the merger or control of at least two Class I railroads . . . the Commission shall approve such an application unless it finds that –
>
> > (1) as a result of the transaction, there is likely to be substantial lessening of competition, creation of a monopoly, or restraint of trade in freight surface transportation in any region of the United States; and

> (2) the anticompetitive effects of the transaction outweigh the public interest in meeting significant transportation needs.

Staggers Rail Act of 1980, Pub. L. No. 96-448, § 228(b), 94 Stat. 1895, 1931 (codified at 49 U.S.C. § 11324(d)). The Act also set deadlines for the Commission to approve a "minor" merger of either 180 or 300 days (depending on factors irrelevant to this case). *Id.* § 228(d), 94 Stat. at 1932–33 (codified at 49 U.S.C. § 11325(b), (c)). In addition, the Staggers Rail Act limited application of subsection (b) approval factors to proceedings under this section "which involve[] the merger or control of at least two Class I railroads"—i.e. "major" mergers. *Id.* § 228(a), 94 Stat. at 1931 (codified at 49 U.S.C. § 11324(b)). Significantly for the issue before us, however, Congress made no relevant changes to subsection (c), which continues to apply to all "transaction[s] under this section," (i.e., section 11324). 49 U.S.C. § 11324(c).

Thus, following passage of the Staggers Rail Act, section 11324's relevant provisions now read as follows:

> (b) In a proceeding under this section which involves the merger or control of at least two Class I railroads . . . the Board shall consider at least – [five factors listed in the statute].

> (c) The Board shall approve and authorize a transaction under this section when it finds the transaction is consistent with the public interest. The Board may impose conditions governing the transaction,

including the divestiture of parallel tracks or requiring the granting of trackage rights and access to other facilities. . . .

(d) In a proceeding under this section which does not involve the merger or control of at least two Class I railroads . . . the Board shall approve such an application unless it finds that –

(1) as a result of the transaction, there is likely to be substantial lessening of competition, creation of a monopoly, or restraint of trade in freight surface transportation in any region of the United States; and

(2) the anticompetitive effects of the transaction outweigh the public interest in meeting significant transportation needs.

Explaining the significance of these changes shortly after Congress passed the Staggers Rail Act, the Seventh Circuit in *Illinois v. ICC*, whose holding we embraced in *Village of Palestine v. ICC*, held that "if the Commission finds no substantial anticompetitive effect flowing from the proposed ["minor"] transaction, its analysis is at an end. At that point, [it] *must* approve the transaction . . . ." *Illinois v. ICC*, 687 F.2d 1047, 1053 (7th Cir. 1982); *see also Vill. of Palestine v. ICC*, 936 F.2d 1335 (D.C. Cir. 1991) (relying on *Illinois v. ICC* to excuse the ICC from considering issues unrelated to competition in exempting a "minor" merger from section 11324(d) review because the Staggers Rail Act limited the ICC's disapproval authority to such issues). Left unanswered

by both *Illinois v. ICC* and *Village of Palestine* was whether the Staggers Rail Act, and specifically subsection (d), similarly narrowed the Commission's *conditioning* authority to competition-related issues and particularly whether the Commission retained authority to impose environmental conditions when approving "minor" mergers. That is the question presented by this case.

Ordinarily, we review "an agency's construction of the statute which it administers" under the familiar principles of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842 (1984). But Canadian National, although apparently accepting that Congress has generally delegated authority to the Board to "speak with the force of law when it addresses ambiguity in the statute" at issue in this case, insists that the Board has not exercised that authority and so is owed no *Chevron* deference here since its views were formulated through neither notice-and-comment rulemaking nor formal adjudication. *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001). In support, the railroad relies on *United States v. Mead Corp.*, in which the Supreme Court observed "a very good indicator of delegation meriting *Chevron* treatment . . . [is] a relatively formal administrative procedure tending to foster . . . fairness and deliberation . . . [such as] notice-and-comment rulemaking or formal adjudication." *Id.* at 229–30. We disagree with Canadian National.

This Court has consistently granted *Chevron* deference to the Board's statutory interpretations when produced under procedures comparable to the ones used in this case. *See, e.g.*, *HolRail, LLC v. Surface Transp. Bd.* 515 F.3d 1313 (D.C. Cir. 2008). Granting *Chevron* deference here would therefore comport with the Supreme Court's recent reminder of "the importance of maintaining a uniform approach to judicial

review of administrative action." *Mayo Found. for Med. Educ. & Research v. United States*, No. 09-837, slip op. at 9 (U.S. Jan. 11, 2011) (internal quotation marks omitted). Moreover, the Board's procedures are far more formal—and thus much more likely to "foster . . . fairness and deliberation"—than those at issue in *Mead*. 533 U.S. at 230. In *Mead*, the Court reviewed an agency interpretation contained in a single letter ruling whose precedential force was limited to the letter's recipient and that was merely one among the many "being churned out at a rate of 10,000 a year [by the] agency's 46 scattered offices . . . ." *Id.* at 233. By contrast, under sections 11324 and 11325, when the Board reviews a merger application it must first publish notice of the application in the Federal Register and receive written comments. 49 U.S.C. § 11325(c). In addition, the requirements of NEPA create further opportunities for public participation. As a result, the proceedings in this case included several Federal Register notices and extensive media, community, agency, and political outreach; twenty-two public hearings in and around Chicago attended by over 7000 people; a 3500 page draft and 3100 page final environmental impact statement; multiple comment periods that produced nearly 13,500 comments; and then a reasoned opinion from the Board directly engaging the relevant statutory issue. This case therefore falls comfortably within the category of agency decision-making procedures that support *Chevron* deference. Indeed, in *Mead* itself the Supreme Court explained, "as significant as notice-and-comment is in pointing to *Chevron* authority, the want of that procedure here does not decide the [issue] for we have sometimes found reasons for *Chevron* deference even when no such administrative formality was required and none was afforded." 533 U.S. at 230–31; *see also Menkes v. U.S. Dep't of Homeland Sec.*, No. 09-5372, slip op. at 18–23 (D.C. Cir.

Mar. 8, 2011) (granting *Chevron* deference to an agency interpretation produced through informal adjudication).

Under *Chevron*, we must first determine whether "the intent of Congress is clear," for if "Congress has directly spoken to the precise question at issue" then we must give effect to Congress's clear intent. *Chevron*, 467 U.S. at 842. At this first step of the *Chevron* analysis we "employ[] traditional tools of statutory construction," *id.* at 843 n.9, to determine whether Congress has "unambiguously foreclosed the agency's statutory interpretation." *Catawba Cnty., N.C. v. EPA* 571 F.3d 20, 35 (D.C. Cir. 2009). Congress may have done so in one of two ways: either by prescribing a precise course of conduct other than the one chosen by the agency, or by granting the agency a range of interpretive discretion that the agency has clearly exceeded. Because at *Chevron* step one we alone are tasked with determining Congress's unambiguous intent, we answer both inquiries without showing the agency any special deference. And if the agency has either violated Congress's precise instructions or exceeded the statute's clear boundaries then, as *Chevron* puts it, "that is the end of the matter"—the agency's interpretation is unlawful. *Chevron*, 467 U.S. at 842.

But if we determine that statutory ambiguity has left the agency with a range of possibilities and that the agency's interpretation falls *within* that range, then the agency will have survived *Chevron* step one. At *Chevron* step two we defer to the agency's permissible interpretation, but only if the agency has offered a reasoned explanation for why it chose that interpretation. *See Cont'l Air Lines, Inc. v. DOT*, 843 F.2d 1444, 1452 (D.C. Cir. 1988). After all, we defer to an agency's statutory interpretations not only because Congress has delegated law-making authority to the agency, but also because that agency has the expertise to produce a reasoned

decision. *Chevron*, 467 U.S. at 844–45; *see also Mayo Found.*, slip op. at 10) (explaining that among "[t]he principles underlying" *Chevron* deference is the need for an agency to apply "more than ordinary knowledge"—i.e., "agency expertise"—when "fill[ing] . . . gap[s] left, implicitly or explicitly, by Congress" (internal quotation marks and citations omitted)). If an agency fails or refuses to deploy that expertise—for example, by simply picking a permissible interpretation out of a hat—it deserves no deference. For that same reason, we give no deference to agency "litigating positions" raised for the first time on judicial review. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988). Thus, again using "traditional tools of statutory construction," *Chevron*, 467 U.S. at 843 n.9, and considering only the rationales the Board actually offered in its decision, we determine whether its interpretation is "rationally related to the goals of" the statute, *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 388 (1999).

Mindful of this framework, we begin our *Chevron* step one analysis where, as explained above, we may overturn the Board's interpretation only if, as Canadian National contends, the Staggers Rail Act unambiguously prohibits the Board from imposing environmental conditions. Arguing that it does just that, Canadian National points to subsection (d)'s mandatory approval language—"the Board *shall* approve [a 'minor' merger] application unless" it has substantial concerns relating to competition. 49 U.S.C. § 11324(d) (emphasis added). This language, according to Canadian National, eliminates all Board discretion to do anything but approve a "minor" merger once the Board finds, as it did here, that the merger will cause no substantial anticompetitive effects. Subsection (d)'s legislative history reinforces this interpretation because it reveals Congress's intent to "narrow the issues before [the Board] so that non-major transactions

could be reviewed expeditiously within the shorter deadlines (now codified at section 11325(d)) that Congress simultaneously enacted." Pet'r Canadian National's Br. 8 ("Pet'r CN's Br.") (summarizing the Staggers Rail Act Conference Report). In addition, seeking to extend *Village of Palestine* and *Illinois v. ICC* to the Board's conditioning authority, Canadian National contends that "[r]equiring environmental issues to be resolved as a condition of approval is the same in substance as denying approval because of unresolved environmental issues," and thus the Board's interpretation rests on a distinction between conditioning and approval authority that is without meaningful difference. *Id.* at 9.

Finally, Canadian National argues that reconciling *Village of Palestine* and *Illinois v. ICC* with the Board's interpretation of subsection (c) renders section 11324 incoherent. As Canadian National sees it, by ruling that the Board must approve "minor" mergers using a competition-only filter, rather than one focused more generally on the public interest, *Village of Palestine* and *Illinois v. ICC* necessarily held that subsection (c)'s first sentence—"[t]he Board shall approve and authorize a transaction under this section when it finds the transaction is consistent with the public interest"—applies only to "major" mergers, whereas the Board interprets subsection (c)'s second sentence—"[t]he Commission may impose conditions governing the transaction"—as applying to both "major" and "minor" mergers. But such an interpretation makes no sense since both sentences refer to the same "transaction" and since, unlike the first sentence, which limits the Board's approval authority to the "public interest," the second sentence supplies no criteria governing what kinds of conditions the Board may impose. Because, according to Canadian National, subsection (d) replaces subsection (c)'s first sentence with respect to

"minor" mergers, it must likewise replace the second sentence.

Canadian National's interpretation is eminently reasonable. But to prevail under *Chevron* step one, the railroad must do more than offer a reasonable or, even the best, interpretation; it must show that the statute *unambiguously* forecloses the Board's interpretation. *See Chevron*, 467 U.S. at 843 n.11 ("The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding."). For several reasons, Canadian National's arguments fall short of meeting that heavy burden.

First, subsection (c)'s plain text applies to all mergers, both "major" and "minor." Congress obviously knew how to limit the Board's authority to either one or the other since it did so in subsections (b) and (d). Subsection (b) applies to all mergers "which involve[] the merger or control of at least two Class I railroads," while subsection (d) applies to all mergers "which do[] not involve the merger or control of at least two Class I railroads." By contrast, subsection (c) applies to all "transaction[s] under this section" and "this section," i.e., section 11324, covers all mergers both "major" and "minor." Yet Canadian National would have us ignore this textual clue, notwithstanding one of the most basic tenets of statutory interpretation, namely, "[w]here Congress includes particular language in one [sub]section of a [provision] but omits it in another [subsection], it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotation marks omitted).

23

Second, because Congress left subsection (c) unchanged when it added subsection (d), and because subsection (c) was, prior to the Staggers Rail Act, the source of the ICC's extraordinarily broad conditioning authority—which the Board argues, and Canadian National nowhere disagrees, included environmental conditioning authority—Canadian National's construction would require us to conclude that subsection (d) impliedly repealed or amended subsection (c). *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662-64 & n.8 (2007) ("*NAHB*") (noting that an implied amendment that "displaces earlier, inconsistent commands" is conceptually identical to an implied partial repeal). Repeals by implication, however, are strongly disfavored "absent a clearly expressed congressional intention." *Branch v. Smith*, 538 U.S. 254, 273 (2003) (citations and internal quotation marks omitted); *see also NAHB*, 551 U.S. at 664 n.8 ("[I]mplied amendments are no more favored than implied repeals."). In other words, for Canadian National to prevail, we must find in subsection (d) a clearly expressed congressional intent to do implicitly what Congress declined to do explicitly—narrow all of subsection (c) to "major" mergers.

Given that subsection (d) refers only to the Board's approval standard, Canadian National's implied repeal argument depends on the proposition that conditioning authority is equivalent to, and can be no broader than, approval authority. But another provision of the Board's organic statute, 49 U.S.C. § 11326, which requires the Board to impose labor *conditions* on most mergers, including most "minor" ones, demonstrates that the Board's conditioning authority *can be* broader than its approval authority. Moreover, this distinction appears throughout the law, perhaps most prominently in First Amendment jurisprudence, which distinguishes between unlawful prohibitions on speech

and lawful time, place, and manner restrictions that place conditions on speech. *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 790-91 (1989). We are thus unpersuaded that by narrowing the Board's approval authority, Congress also necessarily intended to narrow the Board's conditioning authority.

Canadian National's counterarguments are unconvincing. Rejecting the relevance of section 11326, the railroad argues that because that provision "expressly mandates specific (labor) conditions to be added to a merger approval," CN's Reply Br. 7, "there has to be a reconciliation between the two mandates"—to approve based on a competition-analysis and to impose labor conditions, Oral Arg. Tr. 32–33. But subsection (c)'s second sentence also stands as an express grant of conditioning authority, albeit a more general one. Moreover, section 11326's mandatory nature only reinforces the point that Congress saw no inconsistency in investing the Board with conditioning authority broader than its disapproval authority.

Nor do we think the 300 or 180 day statutory deadlines emphasized by Canadian National are so short as to reveal an unambiguous congressional intent to impliedly repeal the Board's environmental conditioning authority. In an analogous line of cases, courts have found clear congressional intent to impliedly repeal NEPA only where there was "a clear and unavoidable conflict" between an agency's organic statute and NEPA, such as statutory deadlines so short that it would be "inconceivable" for an agency to prepare an environmental impact statement within that timeframe and a requirement that agency review "automatically" ends when the statutory deadline passes. *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.*, 426 U.S. 776, 787–89 (1976) (thirty day deadline too short); *see also City of New York v. Minetta*,

262 F.3d 169 (2d Cir. 2001) (sixty day deadline too short). In this case, we see no such "clear and unavoidable conflict." *Flint Ridge Dev. Co.*, 426 U.S. at 788. For one thing, unlike the statutes at issue in the cited NEPA cases, the Staggers Rail Act contains no provision requiring that "minor" mergers are "automatically" approved unless the Board acts before the expiration of the statutory period. Indeed, the Board explained that it "ha[s] certain procedural flexibility" to accommodate environmental review to the relevant timeframes. *Approval* at 33 n.74. Moreover, as the Board observed, in several prior "minor" merger cases it did complete its environmental review and determine what kind of environmental conditions to impose within the allotted timeframes. *Id.* (citing *Burlington N.—Control—Wash. Cent.*, 1 S.T.B. 792, 806-08 (1996)). True, here the Board's environmental review exceeded the relevant 180 day deadline. But given that the statutory timeframes have been adequate in other cases, we have no basis for thinking that "a clear and unavoidable conflict" exists. *Flint Ridge Dev. Co.*, 426 U.S. at 788. But mindful that Congress expected the Staggers Rail Act to expedite Board review of "minor" mergers, we by no means suggest that the Board is free to disregard the statute's timeframes when interpreting the boundaries of its conditioning authority over "minor" mergers. Quite to the contrary, should the Board interpret its authority so broadly as to make review of "minor" mergers within the statutory timeframes "inconceivable," then such an interpretation would violate Congress's clear intent. Nor do we mean to suggest that in imposing environmental conditions, the Board is free to ignore the Act's deadlines. Were the Board to "egregious[ly] . . . [or] unreasonabl[y] delay," merger applicants could seek a writ of mandamus. *See Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 79–81 (D.C. Cir. 1984) (outlining the standard for issuing a writ of

mandamus to compel agency action in response to unreasonable delay).

Canadian National also finds support for its implied repeal theory in one of our "major" merger cases, *Lamoille Valley Railroad Co. v. ICC*, where, in dicta appearing in a footnote, we "reject[ed] . . . suggestions . . . that the Commission has broader discretion in imposing conditions on a merger than in approving or rejecting the merger as a whole." 711 F.2d 295, 301 n.3 (D.C. Cir. 1983). The railroad also cites the ICC's *Illinois Terminal* decision, in which the Commission explained, "[W]e believe we should not attempt to impose a condition on our approval of a transaction related to a matter which we could not lawfully consider as a basis for withholding our approval of that transaction." *Norfolk & W. Ry. Co.—Purchase—Illinois Terminal R.R. Co.*, 363 I.C.C. 882, 891 (1981) ("*Illinois Terminal*"). Neither case supports Canadian National's position. Because *Lamoille Valley* involved a "major" merger we had no need to grapple with the textual or historical cues at issue here. We thus see little relevance to our *Chevron* step one analysis in that decision's offhand remark. As for the ICC's *Illinois Terminal* reasoning, we note that the Commission never said, as Canadian National contends here, that the statute *must* be read to limit the Board's conditioning authority to the breadth of its approval authority. *Illinois Terminal*, 363 I.C.C. at 891. Instead, the ICC said "we believe" that the statute "should" be read that way. By using such words, the ICC made clear that it was exercising discretion delegated by Congress to define the breadth of its conditioning authority, which the agency is free to exercise differently in the future so long as it offers a reasoned explanation for the change. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs*, 545 U.S. 967, 981 (2005) ("Agency inconsistency is not a basis for declining to analyze the agency's interpretation under the

*Chevron* framework."). Although such reasoning, had the Board adopted it here, might well have survived a *Chevron* step two challenge, it has nothing to do with the *Chevron* step one issue we face at this stage of our analysis—whether subsection (d) unambiguously deprives the Board of its subsection (c) authority to impose environmental conditions on "minor" mergers.

Reinforcing our conclusion that section 11324 is ambiguous with respect to the Board's environmental conditioning authority, the relationship between subsections (c) and (d) creates ambiguity even with respect to an authority the Board surely has, namely, to impose competition-related conditions on "minor" mergers. *See Commuter Rail Div., Metra v. Surface Transp. Bd.*, 608 F.3d 24, 32 (D.C. Cir. 2010) ("*Metra*") (noting that the Board primarily focuses on imposing competition-related conditions on "minor" mergers). Indeed, even Canadian National, though agreeing that the Board has such authority, is candidly unsure as to its statutory source. As the railroad explains, it "may be" that subsection (c) rather than having no applicability to "minor" mergers as the railroad otherwise argues, authorizes competition-related conditioning authority for both "major" and "minor" mergers. CN's Reply Br. 6 n.3. "Alternatively, it *may be* that . . . [subsection (c)] appl[ies] only to 'major' transactions, in which case [subsection (d)] can be read, like the antitrust laws, to implicitly authorize" imposing competition-based conditions on "minor" mergers. *Id.* (emphasis added). Given that these provisions "may be" read in any number of reasonable ways, they can hardly be described as unambiguous. And if the relationship between subsection (d) and subsection (c)'s second sentence is ambiguous as to something as fundamental and universally accepted as the Board's authority to impose competition-related conditions, then it would be quite odd to conclude that

the very same relationship between these two subsections—on which the statutory issue in this case turns—is unambiguous as to the Board's authority to impose environmental conditions.

Finally, we disagree with Canadian National that reading subsection (c)'s second sentence as granting the Board environmental conditioning authority necessarily renders the section incoherent. To be sure, if, as the railroad insists, subsection (d) partially repealed subsection (c)'s first sentence so that the sentence applies only to "transactions" involving "major" mergers, then Canadian National would be correct: it would make no sense for the second sentence, which also uses the word "transaction," to cover both "major" and "minor" mergers. *See Comm'r v. Lundy*, 516 U.S. 235, 250 (1996) ("[T]he normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same meaning." (internal quotation marks omitted)). And it would indeed be troubling if the Board's "minor" merger conditioning authority were unconstrained by any statutory criteria. *See Pan. Ref. Co. v. Ryan*, 293 U.S. 388 (1935). But since the Staggers Rail Act left both subsection (c) sentences unchanged, it is also reasonable to read them as continuing to apply to all mergers. This avoids the inconsistency central to Canadian National's argument—interpreting "transaction" to refer to "major" mergers in the first sentence but to all mergers in the second sentence. It also leaves both the Board's approval and conditioning authority constrained by subsection (c)'s broad "public interest" standard. To be sure, as we held in *Village of Palestine* and as the Seventh Circuit held in *Illinois v. ICC*, the Board's authority to *disapprove* a "minor" merger is further constrained by subsection (d)'s more specific command. But because subsection (d) says nothing about conditioning

authority, the Board's subsection (c) conditioning authority need not also be so narrow.

For all these reasons, we conclude that nothing in section 11324 unambiguously forecloses the Board from imposing environmental conditions on "minor" mergers. This conclusion, we emphasize, is narrow. In rejecting Canadian National's argument, we make no definitive judgment about the breadth of the Board's conditioning authority, which might extend beyond environmental conditions. Likewise, the Board is free to interpret its conditioning authority as narrowly as Canadian National insists, so long as it can reasonably defend that decision. We hold only that given the statute's ambiguity, a range of interpretations is permissible, and that the Board's current interpretation falls within that range. *Cf. Metra*, 608 F.3d at 31–33 (upholding the Board's decision *not* to exercise its "extraordinarily broad" discretion to impose contract-altering conditions unrelated to competition on a "minor" merger).

We turn, therefore, to *Chevron* step two where we ask whether the Board has reasonably explained how the permissible interpretation it chose is "rationally related to the goals of" the statute. *AT&T Corp.*, 525 U.S. at 388. Unlike our *Chevron* step one analysis, our review at this stage is "highly deferential." *Nat'l Rifle Ass'n of Amer. v. Reno*, 216 F.3d 122, 137 (D.C. Cir. 2000).

The Board began its analysis by acknowledging that in *Illinois Terminal*, one of the ICC's first post-Staggers Rail Act "minor" merger cases, the Commission had declined to exercise its conditioning power to impose traditional public interest conditions. The Board nonetheless distinguished between environmental conditions and "traditional public interest conditions unrelated to competition." *Approval* at 31.

Environmental conditions are, the Board explained, "different." *Id.*

Most significantly, the Board grounded this distinction in the National Environmental Policy Act. Noting that in NEPA Congress directed agencies to "interpret[] and administer[]" their organic statutes "in accordance" with that statute's environmental protection policies "to the fullest extent possible," 42 U.S.C. § 4332, and that this court in *Natural Resources Defense Council, Inc. v. EPA*, 859 F.2d 156 (D.C. Cir. 1988) ("*NRDC*"), understood that command as "authoriz[ing] the agency to make decisions based on environmental factors not expressly identified in the agency's underlying statute," *id.* at 169, the Board determined that it could "compl[y] with NEPA's mandate by construing the Interstate Commerce Act to permit the imposition of environmental conditions in mergers subject to section 11324(d)." *Approval* at 32.

Challenging the Board's reliance on NEPA, Canadian National argues that "NEPA . . . is a procedural statute" that "does not modify an organic statute." Pet'r CN's Br. 15–16. This is, of course, true. Because NEPA's "mandate to . . . agencies is essentially procedural," *Vermont Yankee*, 435 U.S. at 558, it "does not expand an agency's substantive powers," *NRDC*, 859 F.2d at 169, and "federal judges . . . enforce the statute by ensuring that agencies comply with NEPA's procedures, . . . not by trying to coax agency decisionmakers to reach certain results," *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 194 (D.C. Cir. 1991). As noted above, however, we have observed that where Congress delegates a discretionary decision to an agency, NEPA may, within the boundaries set by Congress, "authorize[] the agency to make decisions based on environmental factors not expressly identified in the agency's underlying statute." *NRDC*, 859

F.2d at 169. Because under *Chevron* an agency exercises such congressionally delegated discretion when it interprets ambiguities within its organic statute, an agency may appropriately decide that NEPA counsels in favor of the more environmentally protective interpretation so long as that interpretation "fall[s] *within* the agency's appropriate province under its organic statute(s)." *Id.* (emphasis added). This is exactly what happened here. Because the interaction between subsections (c) and (d) creates ambiguity about the extent of the Board's conditioning authority over "minor" mergers, the Board relied on NEPA to support its construction of the statute as preserving its authority to impose environmental conditions on "minor" mergers.

The Board believed its reliance on NEPA was particularly appropriate in light of the Staggers Rail Act's legislative history. Early in the legislative process Congress considered but did not later adopt a version of the Act that would have exempted mergers from NEPA, *see* H.R. 7235, 96th Cong. § 309(a) (May 1, 1980), even while it contemporaneously exempted other railroad regulation, *see, e.g.*, Milwaukee Railroad Restructuring Act, Pub. L. No. 96-101, § 19, 93 Stat. 736, 746 (1979) (codified at 45 U.S.C § 917). According to the Board, since NEPA, though merely a procedural statute, is intended to be action-forcing, this legislative history suggests that Congress believed that the Board would still have the capacity to *act*. Canadian National dismisses the relevance of this legislative history, stating "inferences of legislative intent from unenacted legislation are unreliable." Pet'r CN's Br. 17 n.8. The railroad's caution is well taken, but only to a point. Although we would be uncomfortable relying on such legislative history at *Chevron* step one, we think it may appropriately guide an agency in interpreting an ambiguous statute—just how the Board used it here.

Besides its NEPA-based rationales, the Board identified certain other considerations it believed counseled in favor of its interpretation. Specifically, it pointed to another provision in its organic statute, section 11321(a), which exempts merged railroads from "the antitrust laws and from all other law, including State and municipal law, as necessary to let" the merged railroad "carry out" the merger. 49 U.S.C. § 11321(a). Interpreting that provision as exempting merged railroads from state and local environmental laws, the Board worried that if it lacked environmental conditioning authority, then affected communities would be powerless to address substantial environmental impacts caused by "minor" mergers—a result the Board believed Congress could not have intended. The current transaction illustrates the significance of this concern. As the Board explained, although Canadian National's acquisition "is expected to provide nationwide economic benefits," it will also "impose substantial environmental costs on the local communities along the EJ&E line[, including] emergency response delays, increased vehicular traffic congestion and delays, increased noise and vibration, and increased safety issues at highway/rail at-grade crossings." *Approval* at 33–34. And, in fact, to avoid just such scenarios, the Board has, at least since 1996, regularly imposed environmental conditions on "minor" mergers—including in transactions involving Canadian National. *Id.* at 29 & n.56, 31 & n.69.

Canadian National criticizes the Board for relying on "policy argument[s]" best left for Congress instead of "legal argument[s] about the meaning of section 11324(d)." Pet'r CN's Br. 14. But when an agency interprets ambiguities in its organic statute, it is entirely appropriate for that agency to consider, as the Board has done here, policy arguments that are "rationally related to the [statute's] goals." *AT&T Corp.*,

525 U.S. at 388. "[A]s long as the agency stays within [Congress's] delegation, it is free to make policy choices in interpreting the statute, and such interpretations are entitled to deference." *Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1287 (D.C. Cir. 2000) (quotation marks omitted).

Canadian National also attacks the Board for having recognized in its appellate brief only a single, "unworkable" limit—that its conditions "must not be 'tantamount to disapproval.' " CN's Reply Br. 8 (quoting Resp't's Br. 34 n.59). But we do not understand the Board to be taking a position on whether it may impose conditions that would be "tantamount to disapproval." Rather, the Board merely assumes that even if such a limit exists, "the conditions the Board imposed on [Canadian National] [were] not of that sort." Resp't's Br. 34 n.59. In any event, we have no need to resolve whether subsection (d) requires the Board to ensure that the environmental conditions it imposes on a "minor" merger under subsection (c) are not tantamount to disapproval given that Canadian National seems never to have argued during the administrative process either that the Board should adopt such a limit or that the limit was breached. *See L.A. Tucker Truck Lines*, 344 U.S. at 35 (argument waived if not first raised to the agency).

To sum up then, the Board offered three basic rationales in defense of its statutory interpretation: that NEPA counsels in favor of the more environmentally protective interpretation; that had Congress intended to terminate the Board's subsection (c) authority to impose environmental conditions, it would have adopted the amendment exempting the Board's merger review from NEPA; and that if the Board lacked authority to address substantial environmental impacts caused by "minor" mergers, then local communities might be unable to confront such problems. Given our highly deferential

standard of review at *Chevron* step two, we think the latter two explanations are "rationally related to the goals of" the Board's organic statute. *AT&T Corp.*, 525 U.S. at 388. The Board's first explanation likewise supports its statutory interpretation. Not only does the explanation comport with *NRDC*, in which we explained that within the boundaries set by Congress NEPA may "authorize[] the agency to make decisions based on environmental factors not expressly identified in the agency's underlying statute," *NRDC*, 859 F.2d at 169, but it also reflects a reasonable excercise of the Board's discretion to interpret its underlying statute to ensure that its compliance with another statute (NEPA) is more than a pointless bureaucratic exercise. Because we owe an agency great deference at *Chevron* step two, these explanations, taken together, are sufficient to support the Board's conclusion that its subsection (c) conditioning authority still includes the power to impose environmental conditions on "minor" mergers.

## IV.

In addition to its statutory challenge, Canadian National argues that Condition 14, which requires it to bear a substantial portion of the cost of constructing the Ogden Avenue and Lincoln Highway grade separations, is arbitrary and capricious. For their part, Community Petitioners identify a host of alleged defects in the Board's preparation of the environmental impact statement. Because these challenges deal, at least in part, with overlapping issues, we consider them together.

We start by describing in greater detail how the Board's Section of Environmental Analysis prepared the environmental impact statement. With the assistance of HDR Engineering, Inc., an environmental contractor that Canadian National suggested from the Board's pre-screened contractor

list and that SEA approved, SEA began by setting the scope of its environmental investigation. *See* 40 C.F.R. § 1501.7 (setting out "scoping" procedures). Soliciting feedback from other government agencies and the public, SEA published notices in the Federal Register and in local newspapers; held fourteen public meetings attended by over 2600 people; consulted with local, state, and federal agencies and officials; and received almost 4000 comments. During the scoping process, SEA adopted Canadian National's goals as the "purpose and need" of the Board's review of the EJ&E acquisition. *See* 40 C.F.R. § 1502.13 ("The [environmental impact statement] shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action."). Those goals included "improv[ing] [Canadian National's] operations in and beyond the Chicago area by providing . . . a continuous rail route around Chicago, under [Canadian National's] ownership, that would connect the five [Canadian National] lines that presently radiate from Chicago." *Approval* at 9**.**

SEA then published a 3500 page draft environmental impact statement and solicited comments during a sixty-day period. To encourage and facilitate that process, SEA published notices in the Federal Register, placed ads in local newspapers, issued press releases to local media, and held eight public meetings attended by over 4500 people, including 3000 in Barrington. SEA received over 9500 comments. It then published a 3100 page final environmental impact statement, which reflected changes based on additional analysis and responses to public comments.

The final environmental impact statement, which incorporates by reference large portions of the draft, describes SEA's consideration of a wide range of environmental impacts, as well as its examination of particular mitigation

strategies. Because 73% of road crossings on the EJ&E line lack grade separation, SEA studied how increased freight traffic would worsen traffic congestion, increase the risk of collisions, slow emergency responders, and increase the likelihood of hazardous material spills in communities along the rail line.

To study the transaction's impact on traffic congestion, SEA began by articulating three criteria: crossing Level of Service (LOS), a measure of how freely traffic moves at a crossing; queue length, a measure of how far traffic backs up when a train passes; and total vehicle delay, the combined amount of time that freight trains delay all vehicles during a twenty-four hour period. Using these criteria, SEA considered a crossing to be "substantially affected" by the transaction if (1) crossing LOS would drop below a certain level, (2) the vehicle queue would block a major thoroughfare, *or* (3) total vehicle delay would exceed 2400 minutes (40 hours). Applying this framework, SEA winnowed the list of 112 railroad crossings along the EJ&E line down to thirteen "substantially affected" crossings.

As to the increased risk of trains colliding with vechicles, SEA measured vehicle exposure—calculated by multiplying the number of trains per day by the number of vehicles per day—at each crossing. SEA identified three crossings with exposures exceeding or nearing 1 million.

Next, SEA considered three potential traffic mitigation strategies for the thirteen "substantially affected" crossings (which included two of the three crossings with exposures exceeding or nearing 1 million): traffic advisory signals, roadway widening, and "grade separation." Observing that traffic advisory signals offer a cost-effective strategy for preventing long vehicle queues from blocking other

roadways, whereas grade separation is extremely costly and can adversely affect a community's character, SEA favored traffic advisory signals for the four "substantially affected" crossings where long traffic queues would occur. By contrast, SEA recommended grade separation at those crossings that exceeded or neared SEA's thresholds for crossing LOS, total vehicle delay, or vehicle exposure because traffic advisory signals would be ineffective. SEA relied as well on the Federal Highway Administration Handbook's guidance that "crossings should be considered for grade separation . . . whenever," among other things, total vehicle delay exceeds 2400 minutes or vehicle exposure exceeds 1 million. Federal Highway Administration, *Railroad-Highway Grade Crossing Handbook* 151 (2007) ("*Handbook*"). Based on this analysis, SEA recommended traffic advisory signals at four "substantially affected" crossings, grade separation at two such crossings, and no mitigation at five others. Noting that it might also have recommended grade separation for two crossings in Joliet, SEA deferred instead to the voluntary mitigation agreement Joliet had negotiated with Canadian National.

SEA also identified emergency responders who would be "substantially affected" by Canadian National's acquisition of the EJ&E line. Rejecting their calls to impose grade separation, SEA instead recommended installation of closed-circuit cameras to enable emergency dispatchers to monitor freight traffic and adjust dispatch plans accordingly.

With respect to the two crossings designated for grade separation, SEA recommended requiring Canadian National to contribute 15% of the cost. It selected this figure because SEA estimated that the acquisition would, on average, increase traffic delays in the Chicago metropolitan area by 15%.

Turning to the risk of hazardous material spills, SEA projected how frequently Canadian National trains would release such materials within each segment of the EJ&E line and examined the six serious incidents that had occurred in the past five years on the EJ&E line or on Canadian National's five existing Chicago area lines. Based on that information, SEA concluded not only that the risk of a hazardous material release in any particular location would be "remote," but also that any such release would be readily containable. SEA thus rejected the need to install a hazardous material containment system along the EJ&E line, finding instead that existing regulations and Canadian National's current business practices would adequately protect the populace and surrounding environment from hazardous material spills.

In addition to the foregoing, SEA considered how Canadian National's acquisition of the EJ&E line would affect wildlife near the rail line. Among other actions, SEA worked with the U.S. Department of the Interior, state agencies, and Canadian National to limit the railroad's impact on endangered and threatened species.

Once SEA had completed the final environmental impact statement, the Board approved the Canadian National merger. As noted earlier, in that decision, the Board imposed many of the conditions proposed by SEA, including grade separations at Ogden Avenue and Lincoln Highway. *See supra* 8. Although SEA had recommended that Canadian National bear 15% of the cost of each separation, the Board, based on its calculation of the transaction's impact at each crossing, increased the railroad's share significantly—to 67% at Ogden Avenue and to 78.5% at Lincoln Highway. The Board also set a deadline of 2015 for Illinois to commit the remaining funds

and begin construction on the grade separations, after which Canadian National would no longer be responsible for its share. The Board declined to require grade separations at any other crossings because it agreed with SEA that traffic advisory signals would more cost-effectively prevent long traffic queues from blocking other major roads, the principal problem at those intersections.

In its petition for review, Canadian National challenges as arbitrary and capricious the criteria the Board used to select which intersections needed grade separation, as well as the requirement that it bear a substantial portion of those projects' costs. Community Petitioners raise a series of NEPA challenges, including that the Board failed to select and supervise HDR, its third-party contractor; improperly adopted Canadian National's goals as its own; failed to take a "hard look" at the transaction's claimed benefits; failed adequately to consider direct, indirect, and cumulative environmental impacts; overly relied on voluntary mitigation, reporting, and consultation mandates, and compliance with existing laws and regulations to mitigate environmental impacts; and failed adequately to examine the transaction's impact on traffic congestion, emergency responders, the threat of hazardous material spills, and the danger to wildlife. Community Petitioners also argue that the Board acted arbitrarily and capriciously in releasing Canadian National from its financial commitment after 2015.

In reviewing Canadian National's challenges, we apply the APA's arbitrary and capricious standard. 5 U.S.C. § 706(2)(A). Our scope of review under that standard "is narrow." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Ordinarily, we will overturn an agency decision only "if the agency has relied on factors which Congress has not intended it to consider, entirely failed

to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* We review Community Petitioners' challenges under NEPA's equally deferential standard. Our job is principally to "ensure that the agency has adequately considered and disclosed the environmental impact of its actions[,] . . . that its decision is not arbitrary and capricious[, and] . . . that the agency took a 'hard look' at the environmental consequences of its decision." *Comtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 685 (D.C. Cir. 2004). Because "NEPA merely prohibits uninformed—rather than unwise—agency action," we must be careful not to displace the agency's substantive judgment with our own. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989).

*Condition 14*

Attacking the Board's decision to require grade separations at Ogden Avenue and Lincoln Highway, Canadian National criticizes the Board for failing to conduct a cost-benefit analysis and for deviating from the Board's established standards for determining where grade separations are necessary. According to Canadian National, the Board has previously focused only on crossing LOS and not on total traffic delay, queue length, or vehicle exposure. Finding nothing arbitrary and capricious about the Board's decision to use these criteria or in how the Board applied them, we reject Canadian National's challenge.

With respect to Canadian National's demand that the Board use cost-benefit analysis, the railroad points to no statutory or regulatory requirement that the Board do so. Nor does Canadian National cite to any authority—and we are

aware of none—for the proposition that the APA's arbitrary and capricious standard alone requires an agency to engage in cost-benefit analysis. Moreover, the Board relied, reasonably in our view, on expert advice contained in the Federal Highway Administration Handbook, which recommends imposing grade separation irrespective of cost considerations whenever thresholds for total vehicle delay or for vehicle exposure are exceeded, as they were, or nearly were, at both the Ogden Avenue and Lincoln Highway crossings. *Handbook* at 151. In any event, the Board took due account of cost not only when it winnowed down the list of 112 at-grade intersections to the 13 most "substantially affected" ones, but also when it rejected grade separations at crossings in Barrington in favor of more economical traffic advisory signals and closed circuit cameras.

As for Canadian National's argument that the Board's criteria deviated from established standards, the Board points out that it has used some of these same criteria to assess the need for grade separation in previous cases. *See, e.g.*, *San Jacinto Rail Ltd.—Construction Exemption—Burlington N. & Santa Fe Ry.—Operation Exemption—Build-Out to the Bayport Loop*, STB Finance Docket No. 34079, Draft Environmental Impact Statement, at app. F.2 (Dec. 6, 2002) (relying on the Federal Highway Administration Handbook). Moreover, the Board offered a reasoned explanation for why crossing LOS alone was inadequate in this case—namely, its concern that crossing LOS would fail to capture how increased railroad operations in a population-dense region would impact regional mobility and traffic safety—and then selected additional criteria with well-established pedigrees.

Challenging the Board's cost-allocations for the Ogden Avenue and Lincoln Highway grade separations, Canadian National argues that they far exceed well-established federal

and state policies that cap railroad contributions to grade separation projects at 5%. Those policies, however, apply only where a governmental entity has proposed a grade separation paid for with federal funds. *See* 23 U.S.C. § 130; 23 C.F.R. § 646.210(b). By contrast, the higher proportion of costs the Board imposed on Canadian National is not unusual where, as here, the railroad, as opposed to the government, proposes the action that creates the need for grade separation and where no federal funds are involved. *Cf. Atchison, Topeka & Santa Fe R.R. v. Pub. Utils. Comm'n*, 346 U.S. 346, 352–53 (1953) (upholding against a Due Process Clause challenge a state's requirement that a railroad pay 50% of the cost allocation of a grade-separation); *Iowa, Chi., & E. R.R. v. Wash. Cnty.*, 384 F.3d 557, 562 (8th Cir. 2004) (explaining that a state may require a railroad to pay more than 5% of the cost of non–federally funded grade separations so long as the allocation is "fair and reasonable"). The Board's decision is also entirely consistent with its policy of "requiring [railroads] to mitigate transaction-related impacts, but not pre-existing conditions." Resp't's Br. 52.

We reject as well Community Petitioners' challenge to the Board's decision to release Canadian National from its financial obligation if work fails to begin on the grade separations by 2015. As the Board explained, this challenge is premature because "if reasonable progress has been made, yet it becomes clear that construction is not likely to be initiated by 2015 due to circumstances beyond [the Illinois Department of Transportation's] control, such as a long appeals process, the Board will entertain requests to extend the time deadlines" under 49 U.S.C. § 722(c), which gives the Board authority to reopen a proceeding "because of material error, new evidence, or substantially changed circumstances." *Canadian Nat'l Ry. Co.—Control—EJ&E W. Co.*, STB Finance Docket No. 35087, Decision No. 21, at 5–6 (Oct. 23, 2009). If the Illinois

Department of Transportation or one of the Community Petitioners asks the Board to exercise that authority in or around 2015 and the Board refuses, we can consider at that time whether the Board acted arbitrarily or capriciously.

*Barrington Grade Crossings*

As noted above, Community Petitioners argue, among other things, that the environmental impact statement failed to take the requisite "hard look" at traffic congestion and emergency responder delays in Barrington, as well as that the Board failed to adequately examine strategies for mitigating those impacts. Based on the Board's criteria, it concluded that one of Barrington's four crossings, at Hough Street, would be "substantially affected" by the merger, primarily because long traffic queues on Hough Street were projected to block another major thoroughfare, Northwest Highway, which also crosses the EJ&E line. The Board then determined that traffic advisory signals could cost-effectively mitigate this problem and that grade separations across Hough Street and Northwest Highway were unnecessary since neither crossing was projected to exceed Board thresholds for grade separation, such as 2400 minutes of total vehicle delay. Between publishing the draft and final environmental impact statements, the Board also commissioned an additional traffic study, which concluded not only that much of Barrington's traffic congestion stemmed from pre-existing conditions, but also that Canadian National's acquisition would increase congestion during peak morning and evening hours by only 4% to 5%.

Challenging the Board's reliance on the traffic study, Community Petitioners point out that the Village of Barrington commissioned its own study showing that vehicle delays for Hough Street and Northwest Highway would far exceed the 2400 minute threshold. But we decline to consider

the significance of Barrington's traffic study because, as counsel for Community Petitioners conceded at oral argument, they failed to mention their study until their reply brief, thus depriving the Board of a fair opportunity to respond. *See* Oral Arg. Tr. 74; *see also Bd. of Regents of Univ. of Wash. v. EPA*, 86 F.3d 1214, 1221 (D.C. Cir. 1996) ("[W]e have generally held that issues not raised until the reply brief are waived." (citations omitted)). Without their traffic study, Community Petitioners' argument that they were treated differently than similarly situated communities must fail given that the Board's study projected that the Barrington crossings would not exceed the 2400 minute threshold while those crossings warranting grade separation (Ogden Avenue and Lincoln Highway) would.

We likewise find no merit to the Community Petitioners' challenge relating to emergency responders. The environmental impact statement identified which emergency responders would be "substantially affected" and proposed specific measures to mitigate the impact on them. NEPA requires nothing more.

*Remaining NEPA Challenges*

We have reviewed Community Petitioners' other objections to the environmental impact statement and found them without merit. The Board did all that NEPA required of it: it set out the purpose and need for the transaction, evaluated alternatives that would reasonably and feasibly accomplish that purpose and need, identified and took a "hard look" at the transaction's environmental impacts, examined strategies for mitigating those impacts, and fielded and responded to thousands of comments from local, state, and federal agencies and from the community. Having found no "error[s] [that] compromise[d] the objectivity and integrity of the [NEPA] process," we have no need to consider

Community Petitioners' claim that the Board improperly selected or supervised its contractor. *See Citizens Against Burlington*, 938 F.2d at 202 (internal quotation marks omitted).

## V.

For the foregoing reasons, we deny the petitions for review.

*So ordered.*